20 P.3d 984 (2001)
105 Wash.App. 492
STATE of Washington, Respondent,
v.
Scott Alan FREEBURG, Appellant.
No. 44294-5-I.
Court of Appeals of Washington, Division 1.
March 26, 2001.
*986 Nancy P. Collins, Seattle, for Appellant.
Roger Scott Davidheiser, Endel R. Kolde, Cynthia S.C. Gannett, Lee Davis yates, Seattle, for Respondent.

*985 PUBLISHED OPINION (IN PART)
ELLINGTON, J.
The chief issue in this case is whether evidence of possession of a weapon at the time of arrest was properly admitted as evidence of flight. Because we hold that in this case it was not, and constituted prejudicial error, we reverse and remand for a new trial. We also address the instructions on self defense because use of the standard instructions may result in error.

FACTS
At approximately 1:00 in the morning on November 17, 1994, Jose Rodriguez was shot and killed in the Seattle apartment where he lived with his girlfriend, Darlene Martinez. According to Martinez, Scott Freeburg pounded on the apartment door until Rodriguez got out of bed and opened it. She testified that Freeburg said he had come to collect money owed him by Martine Gomez, who had lived in the apartment for a time. After heated discussion, Freeburg barged into the apartment brandishing a gun. Martinez tried to call police, but Freeburg grabbed her, threw her on the couch, held the gun to her head, and told her to shut up or he would kill her. At this point, Rodriguez struck Freeburg on the head with some kind of object. Freeburg began to wrestle with Rodriguez, and Martinez headed toward the door. She heard a gunshot, then a second shot, and saw Rodriguez's body go limp. Freeburg then opened the door and Martinez saw Lawrence Kuhn in the hall holding a gun. Freeburg pushed Martinez against the wall and Kuhn entered the apartment. Freeburg told Kuhn, "if she moves, shoot her."[1] Freeburg then went into the bedroom looking for money. Martinez ran. Kuhn fired a shot at her, but missed. Freeburg and Kuhn then fled.
Freeburg's account of the shooting differed markedly. He testified that he and Kuhn went to see Rodriguez about an automobile trade. Rodriguez invited him and Kuhn into the apartment. Kuhn and Rodriguez began to argue about money and drugs. The altercation escalated into a fight, and Freeburg separated them. As Freeburg turned to admonish Kuhn for his aggression, Rodriguez smashed Freeburg in the back of the head with an unknown object. The impact knocked Freeburg to his knees. He was struck again in the ear. Dazed, he looked up to see Rodriguez pointing a gun at him at close range. Freeburg rushed at Rodriguez. As they wrestled, the gun fired once, but Freeburg got control of the gun. Rodriguez then kneed Freeburg and grabbed his crotch, *987 "squeezing as hard as he could."[2] Freeburg fired the gun without looking or thinking. Rodriguez fell to the couch. Kuhn grabbed the gun, and he and Freeburg left in Freeburg's truck.
Freeburg spent the next four days traveling between Granite Falls, Sedro Wooley, and Ballard. The day after the shooting, he went to his workplace for an hour, arranged to have a coworker deposit his paycheck, and never returned. He never again accessed his bank account. He concluded his affairs at home, visiting his girlfriend in Granite Falls, arranging for the maintenance of several animals left in his care, alerting the cosigner of the loan on his truck to pick it up in the Park-and-Ride in Stanwood. On the fifth day after the shooting, he signed on as crew on a boat sailing to Mexico the next day. Six months later, he sailed to Canada. He assumed a false identity, changing his appearance and carrying false identification. He evaded Canadian law enforcement officers until February 1997, when he was arrested. At the time of his arrest, he carried false identity papers and a loaded .45 caliber handgun.
Freeburg's theory at trial was that he acted in self-defense. The State sought to introduce the circumstances of Freeburg's arrest in Canada, including the fact that Freeburg was armed. Over strenuous objection, the court admitted evidence that Freeburg possessed a gun at the time of his arrest. Freeburg was convicted and this appeal followed.

DISCUSSION

Evidence of Flight
Evidence of other crimes, wrongs, or acts is inadmissible to prove character and show action in conformity therewith.[3] Such evidence may, however, be admissible for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."[4] A ruling under ER 404(b) is reviewed solely for abuse of discretion,[5] which occurs only where the decision of the trial court was manifestly unreasonable or based on untenable grounds.[6]
Admissibility of evidence under ER 404(b) requires a three-part analysis. The court must identify the purpose for which the evidence will be admitted; the evidence must be materially relevant to that purpose; and the court must balance the probative value of the evidence against any unfair prejudicial effect the evidence may have upon the fact-finder.[7]
Evidence that Freeburg possessed a loaded handgun when he was arrested in Canada in 1997 was admitted as evidence of flight. Analytically, flight is an admission by conduct.[8] Evidence of flight is admissible if it creates "a reasonable and substantive inference that defendant's departure from the scene was an instinctive or impulsive reaction to a consciousness of guilt or was a deliberate effort to evade arrest and prosecution."[9] Actual flight is not the only evidence in this category; evidence of resistance to arrest, concealment, assumption of a false name, and related conduct are admissible if they allow a reasonable inference of consciousness of guilt of the charged crime.[10]
When evidence of flight is admissible, it tends to be only marginally probative as to the ultimate issue of guilt or innocence.[11] *988 Therefore, while the range of circumstances that may be shown as evidence of flight is broad, the circumstance or inference of consciousness of guilt must be substantial and real, not speculative, conjectural, or fanciful.[12] The Fifth Circuit has held that the probative value of evidence of flight as circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.[13]
The State argues the evidence of Freeburg's possession of the gun was properly admitted under the general "flight" category because it was related conduct highly indicative of continuing flight, and therefore probative of Freeburg's consciousness of guilt. Alternatively, the State argues the evidence was harmless.
No Washington case has addressed the admissibility of the presence of weapons at the time of arrest following flight. The State relies primarily on two federal cases. In U.S. v. Peltier,[14] the Eighth Circuit applied the analysis of the Fifth Circuit in Myers and affirmed admission of substantial evidence of flight, including weapons evidence. The facts of Peltier were compelling. Two FBI agents had been killed in a shootout on the Pine Ridge Indian Reservation in South Dakota. Five months after the Pine Ridge shootout, Leonard Peltier was one of the occupants of two vehicles stopped by Oregon police. After firing at the officers, Peltier escaped. A search of the vehicle from which he fled yielded a revolver belonging to one of the slain agents; it bore Peltier's thumbprint.
At Peltier's eventual trial, the trial court admitted as evidence of flight other evidence found in the vehicle, including 14 firearms, numerous boxes of shells and grenades, CB radios, scanner equipment, and communication codes. The Eighth Circuit held that this evidence was properly admitted because it was highly probative of guilt, especially given the evidence linking Peltier to the murders. As to evidence of the other weaponry, the court noted that Peltier had essentially occupied a "traveling arsenal ... designed for avoidance of arrest," and that "there was a sufficient number of such evidentiary manifestations to make evidence of flight and of resistance to arrest highly probative of consciousness of guilt, and hence guilt itself [.]"[15] The court held the probative value of the evidence outweighed its prejudicial effect in light of its highly probative nature, the fact that "an elaborate cautionary instruction" was given, and the fact that extensive evidence of a "great number" of firearms used in the shoot out at Pine Ridge had been presented to the jury without objection.[16] The court regarded the latter evidence as so substantial that it rendered the Oregon weapons evidence harmless beyond a reasonable doubt.[17]
In U.S. v. Gaitan-Acevedo, the court found that a defendant's flight behavior (immediate departure to Mexico carrying $60,000 cash and two semi-automatic handguns) was properly admitted because it was linked to his "actual guilt" of crimes involving drug conspiracies.[18] The court did not separately discuss the presence of the handguns, except to indicate that the cash and guns served to confirm that the defendant had a consciousness of guilt of the serious offense with which he was ultimately charged, rather than some lesser offense.[19] *989 Neither of these two federal cases is helpful to our analysis. No factual similarities exist. Freeburg made no attempt to resist arrest, he did not occupy a traveling arsenal, he readily admitted to the arresting officer that he had a gun in his boot, the gun was not the gun used in the shooting of Rodriguez, the arrest occurred more than two years after the shooting, and the presence of the gun does not by itself indicate a consciousness of the serious offense he faced. Finally, no evidence was recovered at the time of arrest to link Freeburg to Rodriguez's death.
In fact, the presence of the gun was apparently Freeburg's idea of insurance against arrest for Rodriguez's death, because a conviction would constitute a third strike offense. When Canadian authorities asked Freeburg about the gun, he said, "The Three Strike Rule forces me to carry a gun. It's the death penalty to me, the slow death penalty, and I have no intention of taking that without a fight."[20] But the jury did not learn of this connection, for the trial court excluded the latter fact as "brutally prejudicial." While we agree with the court's exclusion of Freeburg's statement, in its absence there was nothing to connect the handgun found in 1997 to Rodriguez's death in 1994. The jury was thus left to speculation and conjecture. And even were there some marginal relevance to the evidence of the gun, its unexplained admission was entirely unnecessary to prove consciousness of guilt, given that evidence of Freeburg's flight was plentiful, unequivocal, and undisputed. The State failed to show that the fact Freeburg carried a loaded gun in Canada in 1997 was evidence of consciousness of guilt in the 1994 shooting of Rodriguez, or that its probative value outweighed its harmful effect.
We cannot agree that the evidence was harmless. Evidence of weapons is highly prejudicial, and courts have "uniformly condemned ... evidence of ... dangerous weapons, even though found in the possession of a defendant, which have nothing to do with the crime charged."[21] The prejudicial effect of the evidence of Freeburg's loaded handgun is especially clear in light of the court's refusal to give a limiting instruction.
When evidence is admitted for a limited purpose and the party against whom it is admitted requests such an instruction, the court is obliged to give it.[22] Freeburg requested the following limiting instruction: "Evidence that defendant may have possessed a firearm on February 6th shall not be used by you to infer that he possessed a firearm in [sic] any other occasion."[23] The court declined to give the instruction, apparently believing it to be an impermissible comment on the evidence.[24]
This concern was unfounded. An impermissible comment on the evidence is *990 one "which conveys to the jury a judge's personal attitudes toward the merits of the case or allows the jury to infer from what the judge said or did not say that the judge personally believed the testimony in question." [25] The proposed limiting instruction in no way conveyed the court's attitude toward the merits of the case, nor allowed the jury to infer the court's assessment of witness credibility. Rather, it merely told the jury that the fact Freeburg had a gun when he was arrested created no inference that he had a gun at any other time. This does not constitute a comment on the evidence.[26]
Absent a limiting instruction, jurors could well have regarded the evidence Freeburg had a gun when arrested not as further evidence of flight but rather as tending to show he was a "bad man," or had a propensity to carry guns, or was likely to have brought a gun to Rodriguez's apartment in the early morning hours of November 17, 1994. Given the powerful nature of the evidence, its lack of relevance, and the absence of a limiting instruction, we cannot characterize its admission as harmless. We therefore reverse and remand for a new trial.

Self-Defense Jury Instructions
Presented with a defense of justifiable homicide, the trial court gave four standard instructions relating to self-defense: the justifiable homicide instruction,[27] the act on appearances instruction,[28] the definition of great bodily harm[29] and the definition of great personal injury.[30]
The justifiable homicide instruction provides that homicide is justifiable when the slayer reasonably believes the person slain intended to inflict death or great personal injury. Because self-defense is evaluated from the viewpoint of the "`reasonably prudent person, knowing all the defendant *991 knows and seeing all the defendant sees,'"[31] the act on appearances instruction must also be given to clarify that a defendant's reasonable belief, not actual danger, is all that is required.[32]
Unfortunately, instead of the "great personal injury" language used in the justifiable homicide instruction, the act on appearances instruction uses the term "great bodily harm." Standard definitions exist for both. Great personal injury is an injury that would produce severe pain and suffering; great bodily harm is injury creating probability of death or causing significant serious permanent disfigurement, or creating significant permanent loss or impairment of the function of a bodily part or organ.
The confusion caused by the phraseology in these instructions has been noted by the Supreme Court. In State v. Walden, the court considered the appropriate instructions on self-defense where the alleged assailant was unarmed. The court agreed with the Committee on Jury Instructions, which recommended self-defense instructions use the great personal injury language, not the great bodily harm language because great bodily harm is an element of first degree assault and distinctly defined in that context.[33] The comment to the pattern instruction states:
In the past, cases used the phrases "great personal injury" and "great bodily harm" interchangeably. The committee recommends that the phrase "great bodily harm" no longer be used with the justifiable homicide statute in view of the first-degree assault statute.[34]
Despite the Supreme Court's concern and the Committee's awareness of the issue, the confusion has not been removed: the standard instruction on justifiable homicide uses the great personal injury language, while the act on appearances instruction still contains the great bodily harm language.[35]
The jury here was thus instructed, using the standard instructions, that homicide is justifiable when the slayer reasonably believes that the person slain intended to inflict great personal injury, and that a person is entitled to act on appearances in defending himself if he has reasonable grounds to believe that he is in danger of great bodily harm.
Freeburg asserts that because the instruction defining great bodily harm did not include any reference to his right to act on appearances, and since the jury could have found he did not objectively face great bodily harm, the error may well have affected the outcome.[36]
We agree with Freeburg that the act on appearances instruction should use the great personal injury language. But we observe that there is no likelihood whatsoever that use of the great bodily harm language affected the outcome here. Freeburg's theory at trial was that he was faced with a threat of gunshot at close range, which easily and obviously satisfies both definitions.[37] Had the jury believed him, it would doubtless have believed he faced a threat of great bodily harm.
Different facts, however, might compel a different analysis. Such was the case in State v. Corn.[38] Corn was charged with first *992 and second degree manslaughter in the killing of her boyfriend. They had been quarreling in her kitchen and he assaulted her, pulling her hair and forcing her to the ground, where he choked her. She pushed him off, grabbed a knife from the drying rack, and told him to leave. He rushed at her, fell back against the wall and then fell forward into her arms and collapsed to the floor. He died later that evening of a single knife wound to the heart. At trial, the court gave the justifiable homicide instruction, the act on appearances instruction, and the great bodily harm instruction. The prosecutor relied on the great bodily harm language in his closing argument and informed the jury that self-defense was available only if Corn reasonably believed that she was facing death or "great, permanent, physical injury."[39] The jury began deliberation. The next day, the State advised the court that the great bodily harm instruction was incorrect.[40] The court then submitted the great personal injury instruction and advised the jury to disregard the erroneous great bodily harm instruction. The jury found Corn guilty of manslaughter in the first degree. The trial court then granted Corn a new trial because of the great bodily harm instruction.
Division Three affirmed, finding that the great bodily harm instruction initially given to the jury was erroneous based on Walden[41] and State v. Painter[42] and was not rendered harmless by giving the great personal injury instruction:
[T]he instruction does refer to injury that "creates a probability of death," "causes significant serious permanent disfigurement," or a "significant permanent loss or impairment," none of which was established here. By giving [the great bodily harm] instruction, the trial court here left the impression that the evidence was insufficient to establish self-defense in that Ms. Corn was not faced with this type of injury.[43]
In essence, the court held that where justifiable homicide is claimed in self-defense against an unarmed assailant, the objective definition of great bodily harm could cause a juror to reject self-defense without considering the defendant's right to act on appearances.
Thus it is imperative that trial courts make the correction to the standard instructions that the Committee has not yet made. On remand here, and in future justifiable homicide cases, courts should follow the advice set forth in the comment to WPIC 2.04.01 and replace the phrase "great bodily harm" with the phrase "great personal injury"[44] in the act on appearances instruction.
A majority of the panel having concluded that the remainder of this opinion lacks precedential value, it is ordered that only the foregoing will be published. The balance of the opinion will be filed for public record as provided by RCW 2.06.040.
GROSSE and WEBSTER, JJ., concur.
NOTES
[1] Report of Proceedings (RP) (Oct. 20, 1998) at 50.
[2] RP (Nov. 3, 1998) at 67.
[3] ER 404(b); Carson v. Fine, 123 Wash.2d 206, 221, 867 P.2d 610 (1994).
[4] ER 404(b).
[5] State v. Lane, 125 Wash.2d 825, 831, 889 P.2d 929 (1995).
[6] State v. Powell, 126 Wash.2d 244, 258, 893 P.2d 615 (1995).
[7] State v. Saltarelli, 98 Wash.2d 358, 362-66, 655 P.2d 697 (1982).
[8] E. McCleary, McCORMICK ON EVIDENCE § 271, at 655 (rev.ed.1972).
[9] State v. Nichols, 5 Wash.App. 657, 660, 491 P.2d 677 (1971).
[10] State v. Bruton, 66 Wash.2d 111, 112-113, 401 P.2d 340 (1965); U.S. v. Myers, 550 F.2d 1036, 1049 (5th Cir.1977).
[11] State v. Jefferson, 11 Wash.App. 566, 571, 524 P.2d 248 (1974) (quoting U.S. v. Robinson, 475 F.2d 376, 384 (D.C.Cir.1973)); Wong Sun v. United States, 371 U.S. 471, 483 n. 10, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) ("we have consistently doubted the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime").
[12] Bruton, 66 Wash.2d at 112-13, 401 P.2d 340.
[13] Myers, 550 F.2d at 1049.
[14] 585 F.2d 314, 323 (8th Cir. 1978).
[15] Peltier, 585 F.2d at 323.
[16] Peltier, 585 F.2d at 324.
[17] Peltier, 585 F.2d at 325.
[18] 148 F.3d 577, 588 (6th Cir. 1998).
[19] Gaitan-Acevedo, 148 F.3d at 588.
[20] RP (Oct. 7, 1998) at 22.
[21] U.S. v. Warledo, 557 F.2d 721, 725 (10th Cir. 1977); see Peltier, 585 F.2d at 327; State v. Oughton, 26 Wash.App. 74, 83-84, 612 P.2d 812 (1980) (evidence of a knife totally unrelated to the murder knife found to be of highly questionable relevance; reversed and remanded on other grounds); Moody v. U.S., 376 F.2d 525, 532 (9th Cir. 1967) (evidence a defendant had a gun that had no relation to the charge of smuggling is irrelevant and prejudicially erroneous: "[A] revolver could only be regarded by the jury as indicating that the appellant was a bad man engaged in a criminal enterprise...."). See also State v. Rupe, 101 Wash.2d 664, 705, 683 P.2d 571 (1984) (many view guns with great abhorrence and fear; people might believe that the defendant is a dangerous individual just because he owned guns).
[22] "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." ER 105. State v. Aaron, 57 Wash. App. 277, 281, 787 P.2d 949 (1990) ("it is of vital importance that counsel have the benefit of the instruction to stress to the jury that the testimony was admitted only for a limited purpose and may not be considered as evidence of the defendant's guilt"). See also State v. Goebel, 36 Wash.2d 367, 378-79, 218 P.2d 300 (1950) (if the evidence is admitted, the purpose for which it is admitted should be explained to the jury, and the court should give a cautionary instruction that it is to be considered for no other purpose).
[23] RP (Nov. 4, 1998) at 55.
[24] Trial judges are forbidden to comment to juries upon the evidence presented at trial. Washington Const, art. IV, § 16.
[25] State v. Swan, 114 Wash.2d 613, 657, 790 P.2d 610 (1990).
[26] The Washington Supreme Court Committee on Jury Instructions recommends that no instruction be given on evidence of flight because it "singles out and emphasizes particular evidence.... The fact of flight and the inferences therefrom may be argued to the jury under the circumstantial evidence instruction in a proper case." 11 WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 6.21, note on use at 140 (2d ed.1994) (WPIC). The note does not address whether or when a limiting instruction should be given.
[27] The court instructed the jury:

It is a defense to a charge of murder that the homicide was justifiable as defined in this instruction.
Homicide is justifiable when committed in a lawful defense of the slayer when:
(1) the slayer reasonably believed that the person slain intended to inflict death or great personal injury;
(2) the slayer reasonably believed that there was imminent danger of such harm being accomplished; and
(3) the slayer employed such force and means as a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to the slayer, taking into consideration all the facts and circumstances as they appeared to him, at the time of and prior to the incident.
Clerk's Papers at 203 (emphasis added). See WPIC 16.02.
[28] The court instructed the jury:

A person is entitled to act on appearances in defending himself or another, if that person believes in good faith and on reasonable grounds that he or another is in actual danger of great bodily harm although it afterwards might develop that the person was mistaken as to the extent of the danger.
Actual danger is not necessary for a homicide to be justifiable.
Clerk's Papers at 206 (emphasis added). See WPIC 16.07.
[29] The court instructed the jury:

Great bodily harm means bodily injury that creates a probability of death, or which causes significant serious permanent disfigurement, or that causes a significant permanent loss or impairment of the function of any bodily part or organ.
Clerk's Papers at 207 (emphasis added). See WPIC 2.04, note on use at 21 (2d Ed.1994). The note on use directs this definition should be used whenever an instruction refers to great bodily harm.
[30] The court instructed the jury:

In determining whether a homicide was justifiable, the phrase, "great personal injury" means an injury that the slayer reasonably believed, in light of all the facts and circumstances known at the time, would produce severe pain and suffering if it were inflicted upon either the slayer or another person.
Clerk's Papers at 208 (emphasis added). See WPIC 2.04.01.
[31] State v. Walden, 131 Wash.2d 469, 474, 932 P.2d 1237 (1997) (quoting State v. Janes, 121 Wash.2d 220, 238, 850 P.2d 495 (1993)).
[32] State v. Hutchinson, 135 Wash.2d 863, 884, 959 P.2d 1061 (1998); see also State v. Studd, 137 Wash.2d 533, 545, 552-53, 973 P.2d 1049 (1999) (the act on appearances instruction clarifies that actual danger is not required to establish a claim of self-defense).
[33] Walden, 131 Wash.2d at 475 n. 3, 932 P.2d 1237.
[34] WPIC 2.04.01, comment at 22 (2d ed.1994).
[35] See WPIC 16.02; 16.07.
[36] Freeburg objected to the instruction defining great bodily harm, but did not object to the acts on appearances instruction using the great bodily harm language.
[37] Freeburg argues on appeal that because the injury to his head did not require hospitalization, the jury could have believed it wasn't reasonable to fear significant injury or impairment. However, Freeburg's testimony was that he acted in self-defense after Rodriguez pulled a gun on him, not in response to being struck on the head.
[38] 95 Wash.App. 41, 975 P.2d 520 (1999).
[39] Corn, 95 Wash.App. at 49-50, 975 P.2d 520.
[40] Presumably, the prosecutor was relying upon Walden, 131 Wash.2d at 475 n. 3, 932 P.2d 1237 (the term "great bodily harm" should not be used in self-defense instructions because it is an element of first degree assault and distinctly defined in that context).
[41] 131 Wash.2d at 478, 932 P.2d 1237.
[42] 27 Wash.App. 708, 713-14, 620 P.2d 1001 (1980) (definition of "great bodily harm" in instructions constituted comment on evidence by indicating to jury that evidence was insufficient to support theory of self-defense). The Supreme Court adopted the rationale of Painter in Walden. See Walden, 131 Wash.2d at 477, 932 P.2d 1237.
[43] Corn, 95 Wash.App. at 54-55, 975 P.2d 520 (emphasis added).
[44] Oddly, the most recent comment to WPIC 2.04.01 asserts that the Walden court approved the use of the term "great bodily injury" in self-defense instructions in assault cases. See WPIC 2.04.01, comment at 7 (2d ed.Supp.1998). This appears to be an inadvertent error. The Walden court specifically approved the use of "great personal injury" and disapproved of "great bodily injury" and "great bodily harm" in self-defense cases, partly because great bodily harm is an element of first degree assault. Walden, 131 Wash.2d at 475 n. 3, 932 P.2d 1237.