[No. 50545-9-I.   Division One.   February 17, 2004.]

THE STATE OF WASHINGTON, *Respondent*, v. SCOTT FREEBURG, *Appellant*.

*Scott Freeburg*, pro se.

*Thomas M. Kummerow* and *Nancy P. Collins* (of *Washington Appellate Project*), for appellant.

*Norm Maleng, Prosecuting Attorney*, and *James M. Whisman* and *John B. Castleton, Jr., Deputies*, for respondent.

SCHINDLER, J. — Scott Freeburg appeals his convictions for first degree felony murder, second degree assault, and first degree burglary, and his life sentence under the persistent offender accountability act (POAA), RCW 9.94A.570. He contends: the trial court made several evidentiary errors that deprived him of a fair trial; the prosecutor commented on his right to silence during closing argument; the trial court improperly intervened in jury deliberations and abused its discretion by not permitting the jury to watch a videotape of his trial testimony for a second time during

deliberations; and the trial court erred in finding his federal bank robbery conviction comparable to a Washington felony and imposing a life sentence under the POAA without a jury determination of his prior offenses. Freeburg also raises numerous additional issues in his pro se brief. We affirm his convictions, but because we conclude his federal conviction was not comparable to a Washington felony, we remand for resentencing.

## FACTS

This is Scott Freeburg's second trial on the same charges.[1]

In the early morning hours of November 17, 1994, Freeburg entered the apartment shared by Jose Rodriguez and his girlfriend, Darlene Martinez, and shot and killed Rodriguez.

According to Martinez, she and Rodriguez were in bed when they heard someone pounding on the door. Rodriguez got out of bed. Martinez got up and followed him. Freeburg was at the door. He told Rodriguez that he had come to collect money owed to him by Martine Gomez who had lived at the apartment a few months earlier. Rodriguez told Freeburg he knew nothing of the debt but Freeburg demanded to come in and telephone Gomez.

Rodriguez and Martinez tried to prevent Freeburg from coming into the apartment. He forced his way in, brandishing a gun. When Martinez tried to call the police, Freeburg grabbed her, threw her on the couch, pointed the gun at her head, and told her to shut up or he would kill her. At this point, Rodriguez struck Freeburg on the head with an unknown object. While Freeburg and Rodriguez wrestled, Martinez headed for the door. As she was fleeing, Martinez heard one gunshot followed by a second one. She looked back and saw Rodriguez's body go limp.

---

[1] This court reversed his first conviction and remanded for a new trial. *State v. Freeburg*, 105 Wn. App. 492, 20 P.3d 984 (2001). Some of the facts here are taken from this court's first opinion.

Freeburg then opened the door, and Martinez saw Freeburg's friend Lawrence Kuhn in the hall holding a gun. Freeburg pushed Martinez into the wall, and Kuhn entered the apartment. Freeburg told Kuhn to shoot Martinez if she moved. Freeburg went into the bedroom to look for money. Martinez rushed at Kuhn, knocked him into the wall, and ran out of the apartment. Kuhn fired a shot at her, but missed. Freeburg and Kuhn then fled. Martinez banged on the door of another apartment. The occupant let Martinez in, and they called 911. When they returned to Martinez's apartment, Rodriguez was nearly dead on the couch. Rodriguez later died from the second gunshot, which entered through the back of his neck.

Jeanette Stuker, who was with Freeburg and Kuhn on the night of the murder, was waiting in Freeburg's truck while he and Kuhn went into Rodriguez's apartment. Stuker testified that she had taken drugs that evening and was in and out of consciousness while she waited in the truck. She woke up when she heard screaming and the sound of two gunshots. According to Stuker, when Freeburg and Kuhn returned, Freeburg was bleeding. While they were driving away, Freeburg told Stuker that the guy in the apartment hit him with a lamp and Freeburg shot him. She asked Freeburg if the guy he shot was dead, and Freeburg said he didn't think so because he shot him in the stomach. Freeburg also said that he left his prescription glasses in the apartment and he was afraid the police would be able to identify him through his glasses. Freeburg then said something to Stuker to the effect that he needed to leave the country.

Freda Kuhn testified that a day or two before the shooting, Freeburg and her nephew, Larry Kuhn visited her.[2] She said that during that visit, Freeburg and Kuhn told her they were planning to steal money from a Mexican who had

---

[2] Freda Kuhn testified at the first trial in 1998. Because she was in a nursing home and not competent in the second trial, the transcript of her testimony was read to the jury.

a large sum of money. They also said they planned to steal drugs from him because he was selling drugs to children.

At trial, Freeburg admitted he shot Rodriguez, but claimed it was self defense.[3] He denied there was a plan to rob Rodriguez. According to Freeburg, he and Kuhn went to see Rodriguez about an automobile trade. Rodriguez invited them into the apartment. Kuhn and Rodriguez argued about money and drugs. The argument escalated into a fight, and Freeburg separated the two men. Freeburg said that as he turned towards Kuhn, Rodriguez hit him in the back of the head with an unknown object, knocking him to his knees. Freeburg looked up, saw Rodriguez pointing a gun at him at close range, and rushed at Rodriguez. As the two wrestled, the gun fired once, and Freeburg then got control of it. Rodriguez kneed Freeburg and grabbed his crotch. Freeburg testified that he fired the gun without looking or thinking and Rodriguez fell to the couch.[4] Kuhn grabbed the gun, and he and Freeburg left in Freeburg's truck.

The day after the shooting, Freeburg went to work to arrange to have a co-worker deposit his paycheck.[5] He spent the next four days traveling in northwest Washington. On the fifth day, Freeburg signed on as a crew member for a boat sailing to Mexico. Six months later, he sailed from Mexico to Canada. In Canada he assumed a false identity, carried false identification, and changed his appearance. In February 1997, he was arrested by Canadian authorities.

The State originally charged Freeburg with one count of first degree murder with a firearm. The State later added one count of first degree burglary with a firearm and one count of second degree assault with a firearm. Freeburg

---

[3] Freeburg testified at the first trial. In the second trial in 2002, his videotaped testimony from the first trial was played to the jury.

[4] Freeburg's account of the shooting was undermined by the testimony of his medical expert who described the fatal shot to the back of Rodriguez's neck as "well-placed" and indicative of the shooter having "good control over the victim." 17 Report of Proceedings at 3027.

[5] He never returned to his workplace and never accessed his bank account.

was convicted on all three counts, and he appealed. This court reversed and remanded for a new trial on the ground that it was prejudicial error to admit evidence that Freeburg possessed a weapon when he was arrested in Canada.[6] Following the second trial in March 2002, Freeburg was again convicted on all three counts. The trial court found he is a persistent offender and sentenced him to life in prison without the possibility of parole. Freeburg appeals.

A majority of the panel has determined that only the part of the opinion that addresses the comparability of Freeburg's federal bank robbery conviction should be published. We, therefore, address that issue first.

### Comparability of Prior Federal Conviction

Freeburg argues that his prior conviction under 18 U.S.C. § 2113(a) for bank robbery is not comparable to the crime of second degree robbery in Washington because the Washington crime requires proof of intent to steal whereas federal bank robbery is a general intent crime and does not require such proof.[7]

■ Under the POAA, a persistent offender, one who has been convicted of two "most serious offenses," must be sentenced to life without parole when convicted of a third most serious offense.[8] Under RCW 9.94A.030(28)(o), second degree robbery is a most serious offense for purposes of the POAA. Convictions from other jurisdictions, including federal convictions, which are comparable to Washington's

---

[6] *Freeburg*, 105 Wn. App. 492.

[7] *Compare State v. Kjorsvik*, 117 Wn.2d 93, 110, 812 P.2d 86 (1991) (intent to steal is a nonstatutory element of robbery in Washington) and *Carter v. United States*, 530 U.S. 255, 120 S. Ct. 2159, 147 L. Ed. 2d 203 (2000) (conviction for federal bank robbery under 18 U.S.C. 2113(a) requires only proof of general intent, that is, proof that the defendant possessed knowledge with respect to the actus reus of the crime, but does not require proof of intent to steal).

[8] RCW 9.94A.120.

most serious offenses, are counted as prior convictions.[9] "To determine whether a foreign conviction counts toward an offender score, the sentencing court first compares the elements of the crime in the out-of-state statute to those of comparable Washington statutes in effect when the crime was committed."[10]

In *State v. Bunting*,[11] this court addressed the comparability of the crime of armed robbery in Washington and armed robbery in Illinois. While the Washington crime requires proof of specific intent to steal, the Illinois crime did not, and required only proof of general intent. Because the elements of the crimes differed, this court looked to exhibits in the record to determine whether Bunting's conduct for the Illinois conviction would have violated the crime of armed robbery in Washington and concluded that the only acts the court could consider were the "elements of the crime stated in the indictment."[12] The Illinois indictment stated that " 'by the use of force and while armed with a dangerous weapon [Bunting] took an amount of United States currency . . . .' "[13] Because the indictment did not allege an intent to deprive nor did it "clearly indicate that this element was proved or conceded" by Bunting, this court held the trial court erred in concluding that Bunting's Illinois conviction was comparable to a Washington conviction.[14]

■ The indictment in Freeburg's federal bank robbery case charged that Freeburg and a codefendant, "by force, violence and intimidation, did take from the person and presence" of others $5,667 in money belonging to the

---

[9] RCW 9.94A.030(28)(u).

[10] *State v. Mutch*, 87 Wn. App. 433, 436-37, 942 P.2d 1018 (1997).

[11] *State v. Bunting*, 115 Wn. App. 135, 61 P.3d 375 (2003).

[12] *Id.* at 143. These were the only acts conceded by Bunting in his guilty plea.

[13] *Id.* at 142.

[14] *Id.* at 143.

Peoples National Bank of Washington.[15] As in *Bunting*, the indictment contains no allegation that Freeburg had the specific intent to steal. Nor does the record show that Freeburg conceded this element. The trial court erred in concluding that Freeburg's federal conviction was comparable to a second degree robbery conviction in Washington. We affirm Freeburg's convictions but remand for resentencing consistent with this opinion.[16]

The remainder of this opinion has no precedential value. Therefore, it will not be published but has been filed for public record. *See* RCW 2.06.040; CAR 14.

BECKER, C.J., and BAKER, J., concur.

Review denied at 152 Wn.2d 1022 (2004).

---

[15] Ex. 8.

[16] Although this case is factually similar to *State v. Mutch*, *Mutch* was decided without the benefit of the analysis in *Bunting* and *Carter*. Indeed, the State conceded at oral argument that under the more recent cases of *Bunting* and *Carter* federal bank robbery is not comparable to the crime of robbery in Washington.