
FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2017 APR 24 AM 8: 41

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, )<br><br>Respondent, )<br><br>v. )<br><br>ANDREW JASON TROTMAN, )<br><br>Appellant. ) | DIVISION ONE<br><br>No. 74549-2-I<br><br>UNPUBLISHED OPINION<br><br>FILED: April 24, 2017 |

DWYER, J. — Andrew Trotman appeals from the judgment entered on a jury's verdict finding him guilty of rape in the second degree, assault in the fourth degree, and two counts of supplying liquor to a minor. Trotman was sentenced to a standard-range indeterminate sentence of 280 months to life imprisonment. On appeal, Trotman contends that the trial court erred by denying his motion for a mistrial, by admitting evidence that he fled from police, and by imposing various community custody conditions. Finding no error, we affirm.

I

In March of 2015, 17-year-old A.M.C. was dating Anthony Cox—Trotman's 20-year-old son. A.M.C. lived at home with her mother. Cox would frequently visit A.M.C. and stay the night. On March 28, A.M.C. spent the day with her close friend, B.E., who returned home with A.M.C. to spend the night. That evening, Cox called and text messaged A.M.C. to convince her and B.E. to come

out. Cox told A.M.C. that he had a bottle of Fireball whiskey and was already outside.

When A.M.C. and B.E. went outside, they discovered that Trotman was in the car with Cox. Trotman drove the group around South King County and the four of them shared the whiskey. Ultimately, the car got a flat tire and Trotman pulled over to the side of the road. A.M.C. started feeling sick and vomited outside of the car. The girls decided to telephone B.E.'s older sister and ask her to pick them up. B.E.'s sister picked up the two girls and dropped A.M.C. off at her home for the night. B.E. returned home with her sister.

After arriving home, A.M.C. text messaged Cox to let him know that her bedroom window was unlocked in case he wanted to come over. During the night, A.M.C. received five telephone calls coming from Trotman's cell phone. She answered three of these calls, assuming that Cox was trying to contact her using his father's cell phone, but there was no response from the caller. Each time, she went back to sleep.

A.M.C. awakened around 9:00 a.m. and noticed someone next to her in bed. A.M.C. got out of bed and went into the bathroom, where she noticed that there was semen leaking out of her vagina. A.M.C. went back into her bedroom and realized that the person in her bed was Trotman. A.M.C. searched around the house for her boyfriend, but he was not there. A.M.C. telephoned her older sister to pick her up. Later, A.M.C. went to the hospital. A DNA swab revealed that the semen found inside of A.M.C. belonged to Trotman.

- 2 -

At trial, A.M.C. testified as the State's final witness. During direct examination, A.M.C. testified that Trotman would usually wait in the car or in the living room when Cox would come to visit. The prosecutor asked A.M.C. why Trotman would wait in the car and she replied, "I just didn't want him in my house." The prosecutor asked A.M.C. why she did not want Trotman in the house and she replied, "Because he just got out of jail." Immediately after A.M.C.'s statement, Trotman's counsel moved for a mistrial. The trial court deferred ruling on the motion in order to allow the parties an opportunity to brief the issue.

The trial resumed and the court instructed the jury to disregard A.M.C.'s statement. Previously, Trotman's counsel had agreed with the proposed wording of the instruction, stating, "I don't think there's anything stronger than that, your honor." The trial court later denied the motion for a mistrial.

The jury found Trotman guilty of rape in the second degree, assault in the fourth degree, and two counts of supplying liquor to a minor. Trotman timely appealed.

II

Trotman contends that the trial court erred by denying his motion for a mistrial. This is so, Trotman asserts, because A.M.C.'s testimony that "he just got out of jail" effectively denied him a fair trial. We disagree.

We review a trial court's decision to deny a motion for a mistrial for abuse of discretion. State v. Williams, 159 Wn. App. 298, 321, 244 P.3d 1018 (2011). "A mistrial should be granted only when 'nothing the trial court could have said or

done would have remedied the harm done to the defendant.'" State v. Gilcrist, 91 Wn.2d 603, 612, 590 P.2d 809 (1979) (quoting State v. Swenson, 62 Wn.2d 259, 280, 382 P.2d 614 (1963)).

> "The trial court should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried fairly. Only errors affecting the outcome of the trial will be deemed prejudicial." In determining the effect of an irregular occurrence during trial, we examine "(1) its seriousness; (2) whether it involved cumulative evidence; and (3) whether the trial court properly instructed the jury to disregard it."

State v. Johnson, 124 Wn.2d 57, 76, 873 P.2d 514 (1994) (footnote and internal quotation marks omitted) (quoting State v. Hopson, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989)). We presume that the jurors followed the court's instructions. State v. Stenson, 132 Wn.2d 668, 729-30, 940 P.2d 1239 (1997).

Here, in considering the motion for a mistrial, the trial court first determined that A.M.C.'s statement was not a serious irregularity. In so concluding, the trial court relied on our decision in State v. Condon, 72 Wn. App. 638, 865 P.2d 521 (1993). In Condon, we noted that the "mere fact that someone has been in jail does not indicate a propensity to commit" the charged crime. 72 Wn. App. at 649. Indeed, the fact that someone has been in jail "does not necessarily mean that he or she has been convicted of a crime." Condon, 72 Wn. App. at 649.

The trial court then determined that A.M.C.'s statement did not involve cumulative evidence and that its instruction to the jury was sufficient to cure any prejudice. The trial court concluded:

> Based on the Condon case, combined with the type of irregularity that occurred here, and the fact that there was an

immediate sustaining of the objection and then an instruction to disregard the information, I find that the irregularity was not so serious that the instruction could not prevent an unfair trial for Mr. Trotman.

The trial court's ruling was tenable. A.M.C. was the State's final witness. Although she testified that Trotman had been in jail, the statement was entirely ambiguous. No details surrounding the circumstances of Trotman's incarceration were given. Contra State v. Escalona, 49 Wn. App. 251, 742 P.2d 190 (1987) (witness testified that the defendant had previously committed a crime similar to the charged crime). Upon objection, the trial court immediately and emphatically instructed the jury to disregard A.M.C.'s statement.

> Ladies and gentlemen, I sustained the objection to the last statement that was made by [A.M.C.]. Let me go further and instruct as follows: you are not to consider that statement in any way. You are to disregard it in its entirety and consider only the other information that's provided during the course of this trial.

Trotman's counsel agreed that the trial court's instruction was properly worded. Following closing argument, the jury was again instructed to disregard evidence that was stricken from the record. We presume that the jurors followed the trial court's instructions. Stenson, 132 Wn.2d at 729-30. Accordingly, Trotman has failed to establish error.

### III

Trotman next contends that the trial court erred by admitting evidence that he attempted to flee arrest. This is so, he asserts, both because the arrest occurred 11 days after the commission of the crime and because he was sought pursuant to an unrelated arrest warrant at the time of the arrest. Trotman is wrong.

- 5 -

"Under ER 404(b) evidence of other crimes, wrongs, or acts is presumptively inadmissible to prove character and show action in conformity therewith." State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995) (citing ER 404(b); Carson v. Fine, 123 Wn.2d 206, 221, 867 P.2d 610 (1994)). However, such evidence may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b). We review a trial court's ruling pursuant to ER 404(b) for an abuse of discretion. State v. Fualaau, 155 Wn. App. 347, 356, 228 P.3d 771 (2010) (citing State v. Dennison, 115 Wn.2d 609, 627-28, 801 P.2d 193 (1990)). Abuse of discretion occurs "only where the decision of the trial court was manifestly unreasonable or based on untenable grounds." State v. Freeburg, 105 Wn. App. 492, 497, 20 P.3d 984 (2001) (citing Powell, 126 Wn.2d at 258).

Admissibility of evidence pursuant to ER 404(b) requires a three-part analysis.

> The court must identify the purpose for which the evidence will be admitted; the evidence must be materially relevant to that purpose; and the court must balance the probative value of the evidence against any unfair prejudicial effect the evidence may have upon the fact finder.

Freeburg, 105 Wn. App. at 497 (citing State v. Saltarelli, 98 Wn.2d 358, 362-66, 655 P.2d 697 (1982)).

Generally, "evidence of the flight of a person, following the commission of a crime, is admissible and may be considered by the jury as a circumstance, along with other circumstances of the case, in determining guilt or innocence."

State v. Bruton, 66 Wn.2d 111, 112, 401 P.2d 340 (1965). Evidence of flight is admissible when it creates "'a reasonable and substantive inference that defendant's departure from the scene was an instinctive or impulsive reaction to a consciousness of guilt or was a deliberate effort to evade arrest and prosecution.'" Freeburg, 105 Wn. App. at 497 (quoting State v. Nichols, 5 Wn. App. 657, 660, 491 P.2d 677 (1971)).

> "[T]he probative value of evidence of flight as circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged."

State v. McDaniel, 155 Wn. App. 829, 854, 230 P.3d 245 (2010) (alteration in original) (quoting Freeburg, 105 Wn. App. at 498).

Here, two police officers encountered Trotman in the parking lot of a convenience store 11 days after the rape. One of the officers recognized Trotman because there was a bulletin out for his arrest. That officer called Trotman's name and told him that he was under arrest.[1] Trotman ignored the officer and entered a nearby vehicle. A woman in the vehicle then appeared to tell Trotman to get out of her car. Trotman exited the car and then attempted to flee the area. But he was caught and arrested.

Prior to trial, the State sought the court's permission to admit evidence at trial showing that Trotman had attempted to flee from the police. The trial court

---

[1] The arresting officer's report was admitted during pretrial motions. The report states that the officer told Trotman "to put his hands up and that he was under arrest for Rape First and Burglary First Degree."

- 7 -

began its analysis by determining that there was "no question that from Mr. Trotman's behavior you can infer flight." The trial court then determined that a reasonable inference of consciousness of guilt could be drawn from Trotman's flight.

The trial court then considered the flight in the context of Trotman's other, unrelated warrant. The trial court found that the officers told Trotman that he was under arrest for the specific crime charged.

> They didn't tell him he was under arrest, period. [They] didn't tell him that they had a warrant. They didn't tell him anything more general than that. They told him he was under arrest for the specific crimes charged. And based on that, he ran. And therefore it is possible to infer guilt of the crime charged from consciousness of guilt.

The trial court then considered whether actual guilt could be inferred from consciousness of guilt. The trial court was less persuaded as to this factor, but ultimately determined that actual guilt could reasonably be inferred. Accordingly, the trial court authorized admission of the evidence that Trotman had attempted to flee from the police. However, the trial court excluded from this showing evidence of a physical confrontation between Trotman and the arresting officers. The court determined that such evidence was highly prejudicial and was not relevant to Trotman's guilt.

The trial court's ruling was tenable. The record establishes that the trial court considered whether the jury could infer an instinctive reaction to consciousness of guilt or a deliberate effort to evade arrest and prosecution. In answering in the affirmative, the trial court considered the length of time that passed between the rape and the arrest as well as the fact that Trotman had a

separate and unrelated warrant out for his arrest. Accordingly, Trotman has failed to establish error.

IV

Finally, Trotman contends that the sentencing court erred by imposing certain community custody conditions. We address each condition in turn.

A

Trotman first contends that two of the community custody conditions imposed by the sentencing court exceeded the court's statutory authority. This is so, he asserts, because these conditions are not crime-related. Trotman is wrong.

The sentencing court herein imposed various community custody conditions related to sex offenses. Pertinent here are the conditions prohibiting Trotman from entering "sex-related businesses, including: x-rated movies, adult bookstores, strip clubs, and any location where the primary source of business is related to sexually explicit material," as well as the prohibition against possessing, using, accessing, or viewing "any sexually explicit material as defined by RCW 9.68.130 or erotic materials as defined by RCW 9.68.050 or any material depicting any person engaged in sexually explicit conduct as defined by RCW 9.68A.011(4)" without the prior approval of a sexual deviancy treatment provider.

We review community custody conditions for an abuse of discretion. State v. Sanchez Valencia, 169 Wn.2d 782, 791-92, 239 P.3d 1059 (2010). A sentencing court abuses its discretion if its decision is manifestly unreasonable or

if exercised on untenable grounds or for untenable reasons. State v. Riley, 121 Wn.2d 22, 37, 846 P.2d 1365 (1993). We review the factual bases of crime-related conditions for substantial evidence. State v. Irwin, 191 Wn. App. 644, 656, 364 P.3d 830 (2015).

Pursuant to RCW 9.94A.505(9) and RCW 9.94A.703(3)(f), a sentencing court may impose crime-related prohibitions while a defendant is in community custody. A "'[c]rime-related prohibition' means an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(10). "'Directly related' includes conditions that are 'reasonably related' to the crime." Irwin, 191 Wn. App. at 656 (quoting State v. Kinzle, 181 Wn. App. 774, 785, 326 P.3d 870 (2014)).

Here, the community custody conditions imposed by the sentencing court are reasonably related to the crimes for which Trotman was convicted. Because Trotman was convicted of a sex offense, conditions regarding access to sex-related businesses and access to sexually explicit materials are crime-related and properly imposed. See, e.g., State v. Magana, 197 Wn. App. 189, 389 P.3d 654 (2016) (holding that a community custody condition prohibiting the offender—convicted of rape of a child—from accessing x-rated movies, adult book stores, and sexually explicit materials was crime-related). There was no abuse of discretion.

B

Trotman next contends that the community custody condition requiring him to "Inform the supervising CCO [community corrections officer] and sexual

deviancy treatment provider of any dating relationship," is unconstitutionally vague. We disagree.

The guarantee of due process requires that laws not be vague. U.S. CONST. amend. XIV, § 1; WASH. CONST. art. I, § 3. "The laws must (1) provide ordinary people fair warning of proscribed conduct and (2) have standards that are definite enough to 'protect against arbitrary enforcement.'" Irwin, 191 Wn. App. at 652-53 (internal quotation marks omitted) (quoting State v. Bahl, 164 Wn.2d 739, 752-53, 193 P.3d 678 (2008)). "'[A] community custody condition is not unconstitutionally vague merely because a person cannot predict with complete certainty the exact point at which his actions would be classified as prohibited conduct.'" Sanchez Valencia, 169 Wn.2d at 793 (internal quotation marks omitted) (quoting State v. Sanchez Valencia, 148 Wn. App. 302, 321, 198 P.3d 1065 (2009)). If "persons of ordinary intelligence can understand what the [law] proscribes, notwithstanding some possible areas of disagreement, the [law] is sufficiently definite." City of Spokane v. Douglass, 115 Wn.2d 171, 179, 795 P.2d 693 (1990).

Trotman asserts that "dating relationship" is vague because it covers a wide range of activities and gives too much discretion to the CCO to determine when a violation has occurred. In support of this assertion, Trotman relies on United States v. Reeves, 591 F.3d 77 (2nd Cir. 2010). The court in Reeves concluded that a condition requiring the offender to notify the probation department "when he establishes a significant romantic relationship" was insufficiently clear. 591 F.3d at 80.

> We easily conclude that people of common intelligence (or, for that matter, of high intelligence) would find it impossible to agree on the proper application of a release condition triggered by entry into a "significant romantic relationship." What makes a relationship "romantic," let alone "significant" in its romantic depth, can be the subject of endless debate that varies across generations, regions, and genders. For some, it would involve the exchange of gifts such as flowers or chocolates; for others, it would depend on acts of physical intimacy; and for still others, all of these elements could be present yet the relationship, without a promise of exclusivity, would not be "significant."

Reeves, 591 F.3d at 81.

Trotman's reliance on Reeves is misplaced. The condition in Reeves did not require the offender to report relationships—or even romantic relationships—but, rather, *significant* romantic relationships. 591 F.3d at 81. In concluding that the qualifiers "significant" and "romantic" were too vague to inform the offender of the type of relationship that he was required to report, the court noted that there were no objective criteria with which to tether the terms. Reeves, 591 F.3d at 81. Indeed, the terms left complete discretion in the hands of probation officers to independently determine whether the condition had been violated.

Contrary to Trotman's assertions, "dating relationship" is easily distinguishable from the condition challenged in Reeves. A "date" is commonly defined as "an appointment between two persons of the opposite sex for the mutual enjoyment of some form of social activity," "an occasion (as an evening) of social activity arranged in advance between two persons of opposite sex." WEBSTER'S THIRD INTERNATIONAL DICTIONARY 576 (2002). Significantly, the phrase "dating relationship" has a statutory definition in the context of domestic relations: "a social relationship of a romantic nature." RCW 26.50.010(2).

"Terms must be considered in the context in which used." Bahl, 164 Wn.2d at 759. Moreover, "'[i]mpossible standards of specificity' are not required since language always involves some degree of vagueness." Bahl, 164 Wn.2d at 759 (internal quotations omitted) (quoting State v. Halstien, 122 Wn.2d 109, 118, 857 P.2d 270 (1993)). When the challenged terms are considered together and in light of their dictionary and statutory definitions, the condition is sufficiently clear. The condition is not unconstitutionally vague.

V

Trotman requests that no costs associated with his appeal be assessed against him, as he was found indigent by the trial court. Should the State seek an award of appellate costs, recently amended RAP 14.2 will govern the request.

Affirmed.

We concur: