IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 39955-9-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ABEL DAMON WILKES, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, C.J. — Abel Wilkes appeals his conviction for second degree assault. He argues the trial court erred by admitting evidence in violation of ER 404(b). We agree. The State did not convict Wilkes with proper evidence. It convicted Wilkes by portraying him as a dangerous person. Wilkes is entitled to a new trial.

## FACTS

A.    BACKGROUND

Abel Wilkes (Wilkes) and John Loomis (Loomis) were neighbors and friends for a number of years. Loomis owned and lived on approximately seven acres of rural property. Sometime between 2018 and 2019, Wilkes moved onto Loomis's property. Wilkes and Loomis lived in separate trailers located about 100 feet away from each other.

After Wilkes moved onto the property, Loomis began noticing gradual changes in Wilkes's behavior. He knew that Wilkes suffered from an anxiety disorder, and he felt Wilkes became more argumentative over time. By 2023, the two did not speak with each other often. Around this time, Wilkes developed an interest in shooting firearms in the woods. Wilkes did not go shooting often, but he would sometimes go late at night or early in the morning.

On March 27, 2023, Wilkes went shooting at around 10:00 or 11:00 p.m. The next morning, Wilkes began shooting in the woods around 5:00 a.m. and stopped later that morning. Just before 7:00 a.m., Michelle Hatch (Hatch), a neighbor, heard shots and called the sheriff's office to lodge a noise complaint.

Before leaving for work, Loomis walked to Wilkes's trailer to talk to him about how the shooting was disturbing himself and the neighbors. Loomis planned to ask Wilkes if he could shoot during reasonable hours. Wilkes answered the door, but before Loomis could make his request, Wilkes became frustrated.

Wilkes walked away from Loomis, grabbed a rifle from inside his trailer, returned to the front door, and pointed the rifle at Loomis. Wilkes initially aimed the rifle at Loomis's stomach and eventually raised the barrel to Loomis's head. Wilkes told Loomis to leave his trailer area. At trial, Loomis stated he was afraid he was going to be shot. As Loomis walked back to his trailer, he heard Wilkes fire gunshots.

2

Loomis called the sheriff. He told the 911 operator that his neighbor "'flipped out,'" shots were fired, and Wilkes had mental health issues. 1 Rep. of Proc. (RP) (Aug. 8, 2023) at 131. Loomis also spoke with Corporal Randy Lake (Lake) over the phone. Loomis described his interaction with Wilkes, and Lake asked Loomis to meet him at the police station. At around 8:15 a.m., Loomis arrived at the station and gave a statement. Loomis told Lake about Wilkes's mental health issues and that he had become increasingly unpredictable and incoherent over time. Loomis also told Lake that Wilkes made strange remarks about the Federal Bureau of Investigation during their interaction.

At 10:00 a.m., Detective Joshua Mathena applied for a warrant to search Wilkes's trailer and to arrest him. Corporal Lake decided to use the special weapons and tactics (SWAT) team to arrest Wilkes. The SWAT team arrived at Wilkes's residence at approximately 10:40 a.m., which was about one hour before the warrant was signed. While the SWAT team waited for the warrant to be signed, one of the officers used the police car's public address system, advising Wilkes he was under arrest and to come out of his trailer. Wilkes refused and proceeded to barricade himself inside. The officers fired tear gas rounds and flashbangs through the windows of the trailer to force Wilkes out of his trailer, but these efforts failed.

For approximately 20 hours, the SWAT team destroyed portions of Wilkes's trailer as he refused to surrender. One of the SWAT team members also fired his weapon

3

at Wilkes during the standoff. Wilkes emerged from the crawl space underneath his trailer just before 5:00 a.m. on March 29. Neither Wilkes nor any law enforcement officers were injured from the encounter. Wilkes was medically cleared and booked into the Chelan County jail.

### Charges

The State charged Wilkes with one count of assault in the second degree, together with a firearm enhancement, and one count of obstructing a law enforcement officer. The State later dropped the obstructing charge.

### Wilkes's mental health

Before trial, the court ordered Wilkes to undergo a competency evaluation. The evaluator found that Wilkes was competent to continue court proceedings. The report noted Wilkes's history of paranoid ideation, and the evaluator recommended an additional evaluation if Wilkes's paranoid thinking became more pervasive. Defense counsel told the court that he disagreed with the finding and that he would seek another evaluation if he remained on the case.

Wilkes did not believe his mental health was impaired and asked the court to discharge his attorney. Wilkes noted several disagreements he had with his attorney, including a lack of communication, counsel's encouragement to take a plea deal, and counsel telling him that he was paranoid. The court granted Wilkes's request for new

counsel and stated that Wilkes's replacement counsel could obtain another evaluation, if requested.

B.     TRIAL

Prior to jury selection, the trial court ruled on a number of motions in limine, including three that are relevant on appeal.

1.     *Motions in limine*

The State sought to admit evidence of Wilkes's standoff with SWAT—that he was uncooperative, was in possession of at least one firearm, pointed it at an officer, and that he attempted to conceal firearms.  Defense counsel argued this evidence was irrelevant to the second degree assault charge and was highly prejudicial.  The State argued that the 20-hour standoff was "highly probative" of guilt.  1 RP (Sept. 6, 2023) at 205.  The court ruled that the SWAT evidence was admissible, finding that resisting arrest "allows a reasonable inference of consciousness of guilt, and the probative value outweighs any prejudicial effect on the defendant."  1 RP (Sept. 6, 2023) at 207.

The State also sought to admit all of the firearms the SWAT team found under Wilkes's trailer.  Defense counsel argued this evidence was not admissible because Wilkes only pointed one firearm at Loomis.  The court asked defense counsel if there would be an admission of which firearm was pointed at Loomis and after counsel said

there would not be such an admission, the court ruled that the probative value of admitting all four firearms outweighed the prejudicial effect.

The State also sought to admit evidence that Wilkes, during the standoff, aimed a rifle at Officer Miguel Ruiz. Defense counsel claimed this evidence was not relevant and highly prejudicial. The court agreed and ruled that Officer Ruiz could only testify about seeing Wilkes holding the rifle.

### 2.    *SWAT evidence*

After opening statements, the State began its case by presenting a significant amount of evidence of the 20-hour standoff between Wilkes and the SWAT team. The jury heard about (1) SWAT being involved only in dangerous situations, (2) a command post being formed on the road near Wilkes's residence, (3) the fact a second SWAT team had to be called because the standoff lasted until the following day, (4) the armored vehicle used to assist in Wilkes's arrest, (5) nonlethal force being authorized, (6) the firearms SWAT members had and their protective shields, (7) Wilkes carrying a rifle during the standoff, including the general direction the rifle was pointed, (8) one SWAT member's concern for not only his safety but the safety of every SWAT member, and (9) a comment implying that Wilkes fired his rifle. The jury also heard about (10) one law enforcement witness being called to the scene due to "an officer-involved shooting," and (11) the details of each firearm found under Wilkes's trailer after his arrest, in

6

addition to the presence of Wilkes's rifle scope and body armor.  1 RP (Sept. 7, 2023) at

452.  Finally, (12) the State admitted pictures of Wilkes's trailer, destroyed by SWAT

during the standoff.

### 3.      Hatch testimony

After presenting the SWAT evidence, the State sought to call Hatch, the neighbor,

to testify she heard shots the morning of March 28 and to also explain why she called

911.  Apparently, Hatch would testify that she called 911 because a couple months

before, in January, someone had shot out her window.

Outside the jury's presence, Wilkes requested that the judge not allow Hatch to

testify about the January incident.  The State assured the court it did not intend to suggest

that Wilkes was the person who shot out the window but insisted that "why" Hatch called

911 was important for context.  1 RP (Sept. 7, 2023) at 476.  Wilkes responded that

"why" Hatch called 911 was not relevant and because it would tend to cause the jurors to

believe that Wilkes shot out Hatch's window, it was unduly prejudicial.  The trial court

overruled Wilkes's objection.

Hatch's testimony was brief.  She testified she heard about six shots shortly before

7:00 a.m. on March 28.  The State then asked, "[W]as there an incident in January at your

home that caused you some concern?"  1 RP (Sept. 7, 2023) at 494.  Hatch responded

there was and then agreed that was why she called 911.

> 4. *Testimony about the charged assault*

Finally, the State called Loomis. He testified he wanted to talk with Wilkes that morning to ask him to shoot only during reasonable hours, that Wilkes answered his trailer door and then obtained an assault style rifle, and that he was afraid when Wilkes pointed the rifle at him. Loomis also testified, when he walked back to his trailer, Wilkes fired shots.

> 5. *Conviction, sentence, appeal*

The jury convicted Wilkes of assault in the second degree and found that he had committed the assault with a firearm. The trial court sentenced Wilkes to 45 months of incarceration. Wilkes then timely appealed his conviction to this court.

ANALYSIS

Wilkes argues the trial court committed reversible error under ER 403 and ER 404(b) by admitting the SWAT evidence. In his brief, Wilkes focuses solely on ER 404(b). The State does not assert that Wilkes failed to preserve an ER 404(b) challenge. We therefore consider Wilkes's argument.

*Standard of Review*

We review a trial court's ER 404(b) and ER 403 evidentiary rulings for abuse of discretion. *State v. Fisher*, 165 Wn.2d 727, 745, 202 P.3d 937 (2009); *Erickson v. Robert F. Kerr, M.D., P.S., Inc.*, 125 Wn.2d 183, 191, 883 P.2d 313 (1994). "[W]e give great

deference to the trial court's determination: even if we disagree with the trial court's ultimate decision, we do not reverse that decision unless it falls outside the range of acceptable choices because it is manifestly unreasonable, rests on facts unsupported by the record, or was reached by applying the wrong legal standard." *State v. Curry*, 191 Wn.2d 475, 484, 423 P.3d 179 (2018) (citing *State v. Dye*, 178 Wn.2d 541, 548, 309 P.3d 1192 (2013)).

*ER 404(b)*

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." ER 404(b). However, "evidence of resistance to arrest, concealment, assumption of a false name, and related conduct are admissible if they allow a reasonable inference of consciousness of guilt of the charged crime." *State v. Freeburg*, 105 Wn. App. 492, 497-98, 20 P.3d 984 (2001).

ER 404(b) requires a three-part analysis. *Id.* at 497. "The court must identify the purpose for which the evidence will be admitted; the evidence must be materially relevant to that purpose; and the court must balance the probative value of the evidence against any unfair prejudicial effect the evidence may have upon the fact finder." *Id.*

When evidence of flight is admissible, it tends to be only marginally probative of the ultimate issue of guilt. *State v. Slater*, 197 Wn.2d 660, 668, 486 P.3d 873 (2021). As

a result, Washington has adopted a test applied by the Fifth Circuit of the United States

Court of Appeals to analyze the probative value of such evidence:

> [T]he probative value of evidence of flight as circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.

*Freeburg*, 105 Wn. App. at 498; *accord Slater*, 197 Wn.2d at 668-69.

Wilkes concedes that his refusal to submit to arrest likely constituted flight. He

contends that his flight does not lead to a reasonable inference of consciousness of guilt

because it was explainable by an independent cause. Wilkes, perhaps persuasively,

argues that it was unreasonable to infer that his refusal to submit to arrest was based on

consciousness of guilt because he was suffering from extreme anxiety and paranoia. In

response, the State argues an inference of consciousness of guilt is reasonable because the

SWAT team arrived a few hours after the assault. We need not resolve this particular

issue.

The evidence presented by the State went well beyond the minimally relevant

"resisting arrest" evidence. The State did not seek to prove its case through Loomis's

testimony and with evidence that Wilkes resisted arrest. Instead, the State sought to

prove its case by portraying Wilkes as a dangerous person. This violated ER 404(b). The

State introduced evidence that the SWAT team is involved only in dangerous situations, and its members established a control center, used an armored vehicle, weapons, and shields to protect themselves, and used tear gas and flashbangs to affect an arrest. The State also presented to the jury the cache of firearms and related accoutrements found under Wilkes's trailer, photos of Wilkes's trailer destroyed during the standoff, and implied to the jury that Wilkes fired at SWAT members and had perhaps threatened Hatch two months earlier. Any assertion by the State that it sought to convict Wilkes with proper evidence is disingenuous. Wilkes is entitled to a new trial.[1]

Reversed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, C.J.

WE CONCUR:

_____          _____
Staab, J.                                Murphy, J.

---

[1] Wilkes makes a compelling argument that the trial court abused its discretion by allowing Hatch to testify about the January incident. The January incident invites jury speculation and has little if any relevance to any disputed fact. On this record, we agree the trial court abused its discretion. On remand, the trial court should provide a robust ER 403 analysis if it chooses to admit this evidence; or better yet, exclude it.