# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  55766-5-II |
| Respondent, | |
| v. | UNPUBLISHED  OPINION |
| TONY FRENCH, | |
| Appellant. | |

WORSWICK, P.J. — Tony French appeals his convictions and sentence for 11 crimes, including attempted first degree murder, first degree assault, two counts of second degree assault, first degree burglary, and unlawful possession of a firearm.

French argues that (1) the State presented insufficient evidence to prove that an aluminum bat was a deadly weapon for purposes of second degree assault or for purposes of deadly weapon enhancements, (2) his right to a unanimous jury verdict was violated as to his burglary charge, and (3) the State failed to preserve evidence.  In his statement of additional grounds (SAG), French raises several additional issues.

We hold that (1) the State presented sufficient evidence to prove that an aluminum bat was a deadly weapon for purposes of second degree assault and for purposes of deadly weapon enhancements, (2) the trial court did not violate French's right to a unanimous jury verdict because sufficient evidence supported the alternative means of committing burglary, and (3) the

State did not violate its duty to preserve evidence because the released evidence was only potentially useful evidence, and the State did not act in bad faith in disposing of it.

As to his SAG, we hold that (5) French's pre-*Miranda* statement was made spontaneously and voluntarily, and thus, the court did not err in admitting it, (6) the sentencing court properly included French's prior North Carolina convictions in his offender score, (7) French did not receive ineffective assistance of counsel, (8) the trial court did not improperly admit prior bad acts evidence, and (9) the trial court did not err by imposing a $500 crime victim assessment penalty. Accordingly, we affirm French's convictions and sentence.

FACTS

Tony French and Susan Martinez were domestic partners with a child in common. In March 2018, Martinez obtained a no-contact order against French, which he violated numerous times. On July 14, 2018, French broke into Martinez's home and then hit her boyfriend, Devon Stith, on the head with a child-sized aluminum bat. As French swung the bat at Stith's head, Stith moved closer to French, lessening the force of the blow.

Then, on September 7, French drove a stolen Toyota to Martinez's home and began shooting at Martinez as she sat outside. She ran away from her house, and French spun around and followed her in the Toyota. He continued shooting as she ran across the street. Martinez sustained several gunshot wounds. Multiple witnesses observed the shooting. It was later determined that the firearm used in the shooting was stolen.

After the shooting, law enforcement officers did not locate a gun at the scene. And when law enforcement officers initially interviewed the witnesses, none told them that Stith was armed

or that this was a two-way shootout.  The Toyota driven by French during the shooting was found on September 16.

Several days later, Detective Byron Brockway, Detective Richard Folden, and Forensic Investigator Tiffani Arcadia processed the Toyota.  Investigator Arcadia found bullet holes on the Toyota.  The bullet holes were rusted.  Investigators took multiple photographs of the Toyota, including photos of the three bullet holes.  Of note, the law enforcement officers did not find any bullets holes that suggested a bullet would have entered into the engine block.

At some point, the law enforcement agency released the Toyota to the insurance company, and it was sold at auction.  The law enforcement agency involved here generally does not retain motor vehicles for the duration of the time that a case is pending because it does not have space to store all impounded vehicles.  The agency's policy was that it retained vehicles for the entire case only for homicides or certain civil matters.

On September 25, Deputy Dominique Calata began pursuing a stolen Dodge Caliber. French, who was driving the Dodge, eventually crashed. Subsequently, French ran into the woods.  Somewhere 70 to 100 yards off the road, a police dog found and bit French.  Deputies Jankens and Thompson apprehended French.  The arresting officers did not inform French of his *Miranda* rights while in the woods.[1]  During their walk exiting the woods, French said unprompted, "You guys know who I am; you guys know what I did; all that stuff with my ex-girlfriend was for my kids."  Report of Proceedings (RP) (Aug. 31, 2020) at 43.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 492, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

It took the deputies between five and thirty minutes to return to their vehicles from the woods. After securing French in the police vehicle, Deputy Jankens read him his *Miranda* rights. French invoked his right to remain silent, but he made additional unsolicited statements to Deputy Calata.

After law enforcement incarcerated French, Detective Folden collected DNA from French. During that visit, French asked Detective Folden if he had looked at the bullet holes in the vehicle French drove during the shooting. Detecetive Folden did not recall what he said in response to that inquiry, except that he told French to contact his attorney about the inquiry.

Ultimately, the State charged French with 11 counts, including attempted first degree murder, first degree assault, two counts of second degree assault, first degree burglary, and second degree unlawful possession of a firearm.

## I. PRETRIAL MATTERS

In August 2020, the court held a hearing on pre-trial motions. French had filed motions in limine to exclude witnesses, prior bad acts, French's in custody statements, and personal opinions from the State or any witnesses, among other things. That day, French also filed a motion to dismiss the case because the State had failed to preserve material exculpatory evidence—the Toyota he drove during the shooting.

The court conducted a CrR 3.5 hearing to determine whether French's pre- and post-*Miranda* statements were admissible. At the hearing, the State presented three witnesses, and French did not testify. Both arresting officers testified that French made his statement spontaneously. The court entered findings of fact and conclusions of law. The relevant, undisputed facts were as follows: (1) the arresting officers did not make any promises or threats

4

to French prior to his statements; (2) French did not appear impaired in any way; and (3) "it [was] reasonable that it would take deputies between five and thirty minutes to return to their patrol cars prior to defendant being provided his *Miranda* warnings." Clerk's Papers (CP) at 92. The court ruled that French's statements "to Deputies Jankens, Thompson, and Calata both prior to and after the administration of *Miranda* warnings [were] admissible." CP at 93. The court specifically ruled that "[t]he pre-*Miranda* statements made by the defendant to Deputy Jankens and Deputy Thompson were voluntary statements made spontaneously and not in response to any questioning by the deputies." CP at 92.

The court also heard French's motion to exclude prior bad acts. The State attempted to clarify which bad acts the motion in limine included, and asked French whether his motion included French's attempt to elude the police, his theft of the Toyota, and his possession of the stolen gun used in the attempted murder. French said that he was trying to include everything not related to the charged crimes. The State agreed that it would not seek to admit a number of prior bad acts, including unrelated threats to a woman in Oregon and an alleged kidnapping out of North Carolina. The court reserved ruling on the remaining acts.

On the morning of the first day of trial, the court heard French's motion to dismiss for failure to preserve material exculpatory evidence. French argued that the Toyota was exculpatory because Stith shot at French in the Toyota, and Martinez was actually injured by Stith's stray gunfire. French emphasized that Stith and Martinez, in their initial interviews with law enforcement, said that there was steam or smoke coming from French's vehicle, but the law enforcement officers failed to examine the engine. French further argued that it was routine law enforcement practice to hold vehicles involved in a homicide.

5

The trial court denied French's motion to dismiss, ruling that the Toyota was, at best, potentially useful evidence, and the State did not dispose of the Toyota in bad faith. The court noted that French had access to photographs of the Toyota, which would have allowed him to have an unimpeded discussion of the value of the bullet holes for his self-defense claim. The court further noted that even if French had been able to test the bullet holes, the tests likely would have limited his ability to argue his self-defense claim, rather than support it.

## II. TRIAL

The matter proceeded to a jury trial that lasted three weeks. At trial, Forensic Investigator Loree Barnett testified that the bat used to strike Stith was made of aluminum. Martinez testified that French broke through the sliding glass door to her bedroom where she and Stith were sleeping, and then hit Stith, twice on the head with the bat. Martinez testified that the bat was her son's three-foot long, metal, baseball bat. She also noticed that Stith had a lump on his head after the assault.

Stith testified that, after French broke through the sliding glass door, French hit him in the head with an aluminum baseball bat and then fled. On cross-examination, when asked if the hit was "kind of like a bop on the head," Stith said, "[y]es, the motion came down." RP (Sept. 16, 2020) at 1018. Stith further elaborated that as he was struck, he moved closer, so French couldn't have "as much torque on [the swing] as he probably could have." RP (Sept. 16, 2020) at 1018. Stith testified that French hit him in a quick but not playful manner. Stith also testified that it was not a particularly heavy aluminum bat. But he testified that he had a good lump on his head as a result of the hit. In contrast, French testified that Stith swung the bat at him, and after he deflected the swing, he bopped Stith in the head with the stick end of a wooden rake.

6

Later, Sean Knibbs testified that he had owned a .22 Winchester magnum. He further testified that he believed French stole his magnum based on the information he received. French stipulated that his prior fourth degree assault conviction prevented him from possessing a firearm. French admitted that he possessed a .22 caliber pistol during the shooting, and that this was the gun law enforcement found lying next to him during his arrest.

Later in trial, the State notified the trial court that it planned to have Deputy Calata testify about the following facts: (1) Deputy Calata ran a search on the license plate of the Dodge Caliper French was driving; (2) the search revealed that the Dodge was stolen; (3) Deputy Calata followed the Dodge; (4) French then began driving evasively; (5) Deputy Calata activated his police lights and began a pursuit; (6) French sped away through several turns and ultimately crashed; and (7) Deputy Calata saw French exit the Dodge and run into the woods. French asked that Deputy Calata be prohibited from "go[ing] into the details about the elude any more than just the basic foundation he needs to get to where we are, . . . and it's 404(b), I guess." RP (Sept. 24, 2020) at 1612. The State argued that Deputy Calata's testimony was admissible because "the defendant's flight can be used against him as consciousness of guilt." RP (Sept. 24, 2020) at 1612.

The trial court ruled that the State could elicit how French came to the attention of law enforcement, how the officers pursued him, and that the pursuit ended in a crash and a foot pursuit. The court said that the State should "get to the point on the elude" and specified that the State could use leading questions to stay focused on the relevant information during Deputy Calata's testimony. RP (Sept. 24, 2020) at 1614.

7

That same day, the State sought to admit Exhibit 566-A—a 62-page document with 1,700 entries showing what French had searched on his cell phone—as evidence of flight. The State also sought to admit Exhibit 571—30 pages of screen captures from the phone itself—as evidence of flight. The exhibits show search history records from French's phone after the shooting incident and before French's arrest. The exhibits contain search history records, such as a search for cities with the largest black populations, a search regarding how U.S. Marshalls track fugitives, a search regarding how to outrun a police offer, searches regarding buying fake IDs, and a search regarding "woman shot four times by ex-boyfriend out of hospital," among many other things. RP (Sept. 28, 2020) at 1783. The State agreed to substantial redactions of inflammatory material.

French argued that the exhibits were more prejudicial than probative because they included information that did not relate to the charged offenses. But French conceded that the exhibits were "very strong evidence of knowledge of the incident." RP (Sept. 24, 2020) at 1688. The court noted that the exhibits showed that French investigated his status post-shooting, and arguably, that he was on the run and attempting to stay aware of what that means. The trial court ruled that the State could use the exhibits as illustrative exhibits, and that the State could talk about the volume of the search records. The ruling prevented these exhibits from going back with the jury in deliberation. Rather, the State was required to seek to publish individual pages from the exhibits instead of the entire roughly 90 pages. Finally, the court ruled that the probative value was not substantially outweighed by the prejudicial impact of the exhibits.

Later in trial, French's counsel requested lesser included offense instructions as to both second degree assault counts. The court denied French's request for a lesser included offense

instruction as to the second degree assault related to the shooting, but granted the lesser included offense instruction as to the second degree assault related to the bat incident.

The jury convicted French on 11 counts, and found that French possessed a deadly weapon during the commission of first degree burglary and second degree assault.[2]

### III. POST-TRIAL

After the verdict, the trial court granted French's motion to proceed pro se with stand-by counsel. French began liberally filing motions, including a motion for a new trial based on ineffective assistance of counsel and error in admitting prior bad acts, among other things. The court denied French's motion for a new trial, and specifically refused to grant the motion based on ineffective assistance of counsel because "I'm confident that [defense counsel]'s case production, case presentation, was sufficient. It certainly allowed the jury to make decisions about the jury instructions that they were given, and they did make decisions that were certainly different than what the State was hoping that the jury would make." RP (April 16, 2021) at 2060-61.

French had several prior convictions from North Carolina. Regarding sentencing, French filed a motion objecting to his classification as a persistent offender, arguing that his North Carolina convictions for assault with a deadly weapon and assault on a government official with a deadly weapon were not factually or legally comparable to Washington offenses. The State conceded that French's North Carolina convictions for assault with a deadly weapon and

---

[2] The jury convicted French of (1) First Degree Attempted Murder, (2) Assault in the First Degree, (3) Second Degree Assault, (4) Second Degree Unlawful Possession of a Firearm, (5) Violation of a Court Order, (6) First Degree Burglary, (7) Second Degree Assault, (8) Violation of a Court order, (9) Violation of a Court Order, (10) Violation of a Court Order, and (11) Violation of a Court Order.

possession of a stolen motor vehicle were not legally comparable to offenses under Washington law, but argued that they were factually comparable.

At sentencing, the trial court ruled that French's 2006 North Carolina conviction for possession of a motor vehicle was factually or legally comparable to the Washington crime of first degree possession of stolen property. The court further ruled that French's 2000 North Carolina conviction for assault with a deadly weapon was factually or legally comparable to second degree assault.

Regarding the North Carolina assault with a deadly weapon conviction, French pleaded guilty in March 2000 under former N.C. GEN. STAT. § 14-32(b) (1999). In his plea agreement, French agreed that "there is a factual basis for the entry of the plea." Volume 1, Exhibit 2, PDF at 8. The indictment for that matter stated, "[T]he defendant named above unlawfully, willfully and feloniously did use a metal baseball bat, a deadly weapon, to assault and inflict serious injury upon Corey Damarr by hitting him numerous times with the bat." Volume 1, Exhibit 1, PDF at 4.

Regarding the stolen motor vehicle conviction, French pleaded guilty in November 2006 under former N.C. GEN. STAT. § 20-106 (2006). French agreed that there was "a factual basis for the entry of the plea." Volume 1, Exhibit 4, PDF at 27. The indictment for that matter stated:

> the defendant named above unlawfully, willfully and feloniously did have and possess a 1997 Pontiac Grand Am . . . , a motor vehicle, the personal property of Boyette Auto Sales, valued at $2,500.00, which property was stolen property knowing and having reasonable grounds to believe the property to have been feloniously stolen, taken and carried away.

Volume 1, Exhibit 3, PDF at 21.

Although the State had filed a persistent offender notice, the trial court did not sentence French as a persistent offender. However, the court imposed an exceptional sentence. Moreover, French's sentences for first degree burglary and second degree assault included deadly weapon enhancements. The only legal financial obligation (LFO) the court imposed was a $500 crime victim assessment.

## ANALYSIS

French argues that the State failed to prove that the bat was a deadly weapon, and thus, insufficient evidence supported his conviction for second degree assault and deadly weapon sentencing enhancements. French additionally argues that the trial court violated his right to a unanimous jury verdict. French further argues that the trial court erred when it denied French's motion to dismiss based on the State's failure to preserve material exculpatory evidence. In his SAG, French makes several additional arguments. Each of French's arguments fail.

### I. DEADLY WEAPON

French argues that his right to due process was violated because the State failed to prove the baseball bat was a deadly weapon for purposes of his second degree assault conviction and the sentencing enhancements. We disagree.

There is sufficient evidence to support a conviction where, "after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). When the defendant challenges the sufficiency of the evidence, he "admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *Salinas*, 119 Wn.2d at 201. We

consider circumstantial and direct evidence with equal reliability when determining the sufficiency of the evidence. *State v. Scanlan*, 193 Wn.2d 753, 770, 445 P.3d 960 (2019).

A.      *Second Degree Assault*

French argues that the State presented insufficient evidence to prove he committed second degree assault because the State failed to prove that the aluminum child-sized baseball bat was a deadly weapon.

One prong by which a person commits second degree assault is by "assault[ing] another with a deadly weapon." RCW 9A.36.021(1)(c). A deadly weapon is statutorily defined as an "instrument, . . . which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or substantial bodily harm." RCW 9A.04.110(6). "'Circumstances' include 'the intent and present ability of the user, the degree of force, the part of the body to which it was applied and the physical injuries inflicted.'" *State v. Shilling*, 77 Wn. App. 166, 171, 889 P.2d 948 (1995) (quoting *State v. Sorenson*, 6 Wn. App. 269, 273, 492 P.2d 233 (1972)). "Ready capability is determined in relation to surrounding circumstances, with reference to potential substantial bodily harm." *Shilling*, 77 Wn. App. at 171.

"'Substantial bodily harm' means bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or which causes a fracture of any bodily part." RCW 9A.04.110(4)(b).

Giving all reasonable inferences in favor of the State, any rational jury could find that the bat was a deadly weapon. The weapon here was a three-foot long, aluminum baseball bat.

12

French is an adult man who swung the bat at Stith's head. The hit caused a lump to appear on Stith's head. The degree of force French applied is not entirely clear. Stith characterized the hit as a bop. But he also testified that he moved closer to French during the swing, preventing French from applying as much torque on his swing as he intended. French provided materially different testimony, stating that he actually hit Stith on the head with the wooden end of a rake. But by challenging the sufficiency of the evidence, French admits the truth of the State's evidence—that French swung a bat at Stith's head.

Under these circumstances, the bat was readily capable of causing substantial bodily harm because an adult swinging a three-foot aluminum bat at someone's head, a vulnerable part of their body, is readily capable of causing substantial bodily harm. Merely because the strike was characterized as a bop does not prevent a rational jury from concluding that the bat was a deadly weapon. This is because French attempted to the use the bat with more force than was actually applied, but was stymied due to Stith's maneuver. Accordingly, we hold that, under the circumstances here, the bat was a deadly weapon for purposes of assault.

B.      *Sentencing Enhancements*

French argues that the State presented insufficient evidence to support the deadly weapon special verdicts regarding his burglary and second degree assault convictions. We disagree.

A person who is armed with a deadly weapon during the commission of his crime may be subject to a sentence enhancement. RCW 9.94A.825. For purposes of a deadly weapon special verdict, a deadly weapon means

> an implement or instrument which has the capacity to inflict death and from the manner in which it is used, is likely to produce or may easily and readily produce death. The following instruments are included in the term deadly weapon: . . . any metal pipe or bar used or intended to be used as a club.

RCW 9.94A.825. A bar ordinarily means a "a rod-like piece of iron or steel often pointed at one or both ends or terminating at one end in a cutting edge and used as a digging, breaking, or prying tool" or "a solid piece or block of some material usu. rectangular and considerably longer than it is wide." *Bar*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (8th ed. 2002). And a pipe ordinarily means "a long hollow cylinder (as of metal, clay, concrete, plastic) used for conducting a fluid, gas, or finely divided solid and for structural purposes." *Pipe*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (8th ed. 2002). A club ordinarily means "a heavy staff esp. of wood usu. tapering and sometimes having an attached head of stone or metal wielded with the hand as a striking weapon." *Club*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (8th ed. 2002).

Here, the aluminum baseball bat was a tubular aluminum object longer than it was wide and weightier on one side. The plain meaning of "any metal pipe or bar" encompasses metal bats. RCW 9.94A.825. And French used the bat as a club by swinging it at Stith's head. Accordingly, we hold that the aluminum bat at issue here was per se a deadly weapon under RCW 9.94A.825, and therefore, French possessed a deadly weapon during the commission of the first degree burglary and second degree assault as a matter of law.

French also argues that the State was required to present expert testimony to prove that swinging a metal bat at someone's head readily produces death because it is outside the range of facts known to a lay juror. Generally, expert testimony is required "when an essential element in a case is best established by opinion but the subject matter is beyond the expertise of a lay witness." *State v. Stumpf*, 64 Wn. App. 522, 526-27, 827 P.2d 294 (1992) (quoting 5A K. Tegland, *Washington Practice: Evidence Law and Practice* § 300, at 435 (3d ed. 1989)).

14

But here, expert testimony is unnecessary to prove the obvious fact that swinging a metal bat at someone's head could readily produce death.

We hold that the aluminum bat here was a per se deadly weapon because it was a "metal pipe or bar used or intended to be used as a club." RCW 9.94A.825.

## II. UNANIMOUS JURY VERDICT

French argues that the trial court violated his right to a unanimous jury verdict because sufficient evidence did not support each alternative means of committing first degree burglary. We disagree.

The Washington Constitution provides criminal defendants with the right to a unanimous jury verdict. WASH. CONST. art. 1, § 21. This unanimous jury verdict right may apply to the means by which the defendant commits a crime when the crime charged is an alternative means crime. *State v. Owens*, 180 Wn.2d 90, 95, 323 P.3d 1030 (2014). Where sufficient evidence exists

> to support each of the alternative means submitted to the jury, a particularized expression of unanimity as to the means by which the defendant committed the crime is unnecessary to affirm a conviction because we infer that the jury rested its decision on a unanimous finding as to the means.

*State v. Ortega-Martinez*, 124 Wn.2d 702, 707-08, 881 P.2d 231 (1994). But where there is insufficient evidence to support any of the means, the jury must make a particularized expression of unanimity. *Owens*, 180 Wn.2d at 95.

First degree burglary is an alternative means crime. *State v. Williams*, 136 Wn. App. 486, 498, 150 P.3d 111 (2007).

> A person is guilty of burglary in the first degree if, with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building and if, in entering or while in the building or in immediate flight therefrom,

15

the actor or another participant in the crime (a) is armed with a deadly weapon, or (b) assaults any person.

RCW 9A.52.020(1). Sufficient evidence exists to support a conviction if "after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *Salinas*, 119 Wn.2d at 201. We review the sufficiency of the evidence de novo. *State v. Lambert*, 199 Wn. App. 51, 71, 395 P.3d 1080 (2017).

Because burglary is an alternative means crime, and there was no particularized expression of unanimity as to the means by which French committed the crime, sufficient evidence must support each of the alternative means submitted to the jury. The jury instruction as to first degree burglary provided the same alternative means as the statute. French does not argue that the evidence was insufficient to show an assault, but rather argues that, because the aluminum bat did not constitute a deadly weapon, there was insufficient evidence to show that he was armed with a deadly weapon during the commission of the burglary.

But, as addressed above, the aluminum bat French used constituted a deadly weapon under RCW 9A.04.110(6). Therefore, there was sufficient evidence to show that French was armed with a deadly weapon. As such, a particularized expression of unanimity is unnecessary to affirm the conviction because sufficient evidence supports each of the alternative means. Accordingly, we hold that the trial court did not violate French's right to a unanimous jury verdict.

### III. FAILURE TO PRESERVE EVIDENCE

French argues that the trial court erred by denying French's motion to dismiss because the State violated his right to due process by failing to preserve material exculpatory evidence when it allowed the Toyota to be destroyed. French argues that even if the Toyota was not

16

material exculpatory evidence, his right to due process was violated because law enforcement acted in bad faith by not preserving the Toyota for the defense to conduct its own analyses. We disagree.

Washington's due process clause provides the same level of protection as its federal counterpart as it relates to a criminal defendant's right to discover potentially exculpatory evidence. *State v. Wittenbarger*, 124 Wn.2d 467, 474, 880 P.2d 517 (1994). The State has a duty to disclose material exculpatory evidence and preserve such evidence. *Wittenbarger*, 124 Wn.2d at 475. We review de novo whether evidence constitutes material exculpatory evidence. *State v. Burden*, 104 Wn. App. 507, 512, 17 P.3d 1211 (2001). The State has no absolute duty "to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Wittenbarger*, 124 Wn.2d at 475 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988)).

Failure to preserve material exculpatory evidence warrants dismissal of the State's charges. *Wittenbarger*, 124 Wn.2d at 475. Material exculpatory evidence is evidence that "possess[es] an exculpatory value that was apparent before it was destroyed and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Wittenbarger*, 124 Wn.2d at 475.

However, if the evidence the State failed to preserve is only potentially useful evidence, dismissal is not warranted unless the defendant shows bad faith on the part of the State. *Wittenbarger*, 124 Wn.2d at 477. "'Potentially useful' evidence is 'evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.'" *State v. Groth*, 163 Wn. App. 548, 557, 261 P.3d 183 (2011)

(quoting *Youngblood*, 488 U.S. at 57). And bad faith "turn[s] on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56 n.*. If the State destroys potentially useful evidence to comply with a good faith established policy, that fact weighs against a finding of bad faith. *Wittenbarger*, 124 Wn.2d at 477.

French argues that the Toyota was material exculpatory evidence because law enforcement officers took photographs of the damage, and examined it for bullets, casings, broken glass, and tire treads; but they failed to examine the engine for bullet damages, determine whether the bullet holes were caused by French's gun, or conduct a trajectory analysis regarding the holes. It is unclear how law enforcement's decision to do certain tests and not others makes the Toyota material exculpatory evidence.

At the trial court's hearing, the thrust of French's argument seemed to be that the Toyota was exculpatory because the holes on the Toyota would show that Stith fired at him, which then provides the inference that Stith's stray gunshots wounded Martinez, not French's. French later testified to support that theory at trial.

Even if further testing showed that the bullet holes were not caused by French's weapon, that would not make the Toyota exculpatory. Rather, French would have to show that the Toyota possessed an exculpatory value that was apparent before it was destroyed. In other words, French would have to show not only that Stith's weapon caused the holes in the Toyota at the time of the shooting, but that this alleged fact was apparent to law enforcement officers. However, a second weapon was not located at the scene. And no witnesses testified that this was a two-way shootout. So, French would have been unable to show that Stith caused the holes.

Moreover, no evidence was presented to show that it should have been apparent to law enforcement that Stith caused these holes, and therefore, there is no evidence to suggest that they knew the Toyota was exculpatory when they released it. At the hearing on the motion to dismiss, the parties admitted that Stith saw steam or smoke coming from the Toyota, but that testimony, on its own, does not create the inference that Stith caused the bullet holes in the Toyota. And, in any case, a law enforcement officer testified that they examined the vehicle and did not find any bullet holes in or around the engine compartment. Thus, there is no showing that the Toyota was material exculpatory evidence.

Even if the Toyota was material exculpatory evidence, French had access to comparable evidence by other reasonably available means via the many photographs law enforcement officers took of the Toyota from various angles, including the three rusty holes.

Accordingly, we hold that the Toyota is only potentially useful evidence. The issue then becomes whether French can show that law enforcement released the Toyota in bad faith. And bad faith turns on whether law enforcement knew that the Toyota was exculpatory. But as addressed above, there was no evidence that Stith fired a gun. Moreover, the law enforcement agency's retention policy was that vehicles were not retained for the entire matter unless it was a homicide case, which this case was not. French failed to prove that the State violated its policy by releasing the Toyota. And so, law enforcement had no knowledge that the Toyota was exculpatory, and the agency followed standard procedure when it released the vehicle.

French argues that law enforcement had notice that the Toyota was exculpatory because he asked a detective whether he had seen bullet holes in the Toyota. But French asking whether

19

the Toyota had bullet holes did not put law enforcement on notice that the Toyota was exculpatory. Accordingly, we hold that law enforcement did not release the Toyota in bad faith.

Consequently, we hold that the State did not violate its duty to preserve evidence.

IV. STATEMENT OF ADDITIONAL GROUNDS

In his SAG, French argues that the trial court erred by (1) admitting his pre-*Miranda* statement, (2) denying his motion to dismiss based on the State's failure to preserve evidence, (3) ruling that two of his prior North Carolina convictions were legally or factually comparable to Washington offenses, (4) denying his motion for a new trial based on ineffective assistance of counsel, (5) denying his motions in limine to exclude prior bad acts, witnesses offering personal opinion testimony, the State offering personal opinion testimony, and to exclude witnesses, and (6) failing to waive his LFO. We disagree with French's arguments.

A.      Miranda *Statements*

French argues that the trial court erred in admitting his pre-*Miranda* statement. We disagree.

Washington's constitution provides the same level of protection against self incrimination as the Fifth Amendment to the United States Constitution. *State v. Unga*, 165 Wn.2d 95, 100, 196 P.3d 645 (2008). An officer must issue *Miranda* warnings before engaging in custodial interrogation. *State v. Richmond*, 65 Wn. App. 541, 544, 828 P.2d 1180 (1992). Interrogation occurs absent express questioning where law enforcement officers say any words or engage in any actions that are reasonably likely to elicit an incriminating response, viewed from the perspective of the suspect. *State v. Sargent*, 111 Wn.2d 641, 650, 762 P.2d 1127 (1988). An in custody, pre-*Miranda* statement is presumed involuntary. *State v. Ustimenko*, 137 Wn. App.

109, 115, 151 P.3d 256 (2007). To determine whether a statement is voluntarily given, courts look at the totality of the circumstances—including the condition of the defendant, his mental abilities, and the conduct of law enforcement officers. *State v. Broadaway*, 133 Wn.2d 118, 132, 942 P.2d 363 (1997).

A trial court is required to enter written findings and conclusions after a CrR 3.5 hearing. CrR 3.5. Findings entered after a CrR 3.5 hearing are "verities on appeal if unchallenged." *Broadaway*, 133 Wn.2d at 131.

The statement French complains of is, "You guys know who I am; you guys know what I did; all that stuff with my ex-girlfriend was for my kids." RP (Aug. 31, 2020) at 43. French does not explicitly challenge the trial court's factual findings, rather he argues that his pre-*Miranda* statement was not voluntarily made. He mentions that he had just been bitten by a police dog, and had been lying in blackberry bushes. He also mentions several facts in his SAG that are inconsistent with the trial court's written findings of fact, including that (1) when he made the confession, "he was under arrest at gun-point to the head," and (2) he did not make his statement spontaneously. SAG at 2. French did not testify at the CrR 3.5 hearing, and all the trial court's findings were uncontested. Setting aside that the trial court's unchallenged and uncontested findings of fact are verities, nothing in the record supports French's assertion that there was a gun to his head when he made the statement. Rather, law enforcement officers testified he was taken into custody at gunpoint until he had been secured in cuffs. Additionally, both arresting officers testified that French made his statement spontaneously.

The court's unchallenged findings prove that a police dog located and bit French after he fled 70 to 100 yards from the road and into the woods, French did not "appear to be impaired in

any way," and no deputies made any threats or promises to French prior to his statements. CP at 91. Based on the aforementioned facts, the court ruled that French was in custody, that "it [was] reasonable that it would take deputies between five and thirty minutes to return to their patrol cars prior to defendant being provided his Miranda warnings," and that French's pre-*Miranda* statement was made voluntarily and spontaneously. CP at 92. We agree.

Law enforcement officers did not engage in interrogation or coercion under *Miranda*. The mere fact that French was bitten by a dog to hinder his retreat into the woods does not make French's spontaneous statement coerced.

We hold that French's pre-*Miranda* statement was properly admitted.

B.      *Failure to Preserve Material Exculpatory Evidence*

French argues that the trial court erred when it denied his motions to dismiss because the State failed to preserve evidence—the Toyota French drove during the attempted murder. We have addressed these issues above and do not address them again.

C.      *Offender Score*

French argues that the trial court erred by counting two of his prior North Carolina convictions in his offender score because (1) the State failed to prove, by a preponderance of the evidence, the existence of his prior convictions; (2) French's March 21, 2000 North Carolina assault with a deadly weapon conviction is not factually comparable to the Washington crime of second degree assault; (3) French's November 16, 2006 North Carolina possession of a stolen motor vehicle conviction is not factually comparable to the Washington crime of first degree possession of stolen property.

22

We review de novo the calculation of an offender score. *State v. Wilson*, 113 Wn. App. 122, 136, 52 P.3d 545 (2002). Prior convictions are used to calculate the offender score. RCW 9.94A.525. To be counted, prior convictions from foreign jurisdictions must be legally or factually comparable to Washington offenses. *State v. Olsen*, 180 Wn.2d 468, 472-73, 325 P.3d 187 (2014). The State bears the burden of showing that the out-of-state convictions exist and are comparable. *Olsen*, 180 Wn.2d at 472. When we engage in comparability analysis, we apply the law existing at the time of the prior out-of-state conviction. *In re Pers. Restraint of Canha*, 189 Wn.2d 359, 372, 402 P.3d 266 (2017). To count an out-of-state conviction in the defendant's offender score, we must first determine whether the foreign conviction is legally comparable to a Washington offense. *Canha*, 189 Wn.2d at 367. If it is not legally comparable, we then analyze whether the foreign conviction is factually comparable to a Washington offense. *Canha*, 189 Wn.2d at 367

The State conceded that the two prior convictions at issue were not legally comparable to offenses under Washington law. So, we need consider only whether the convictions are factually comparable.

To determine if an out-of-state conviction is factually comparable, we determine "whether the defendant's conduct would have violated the comparable Washington statute." *Olsen*, 180 Wn.2d at 473. When making that determination, we "consider only facts that were admitted, stipulated to, or proved beyond a reasonable doubt." *Olsen*, 180 Wn.2d at 478. When determining the effect of a guilty plea, we look to the law of the jurisdiction under which the plea was entered. *See Olsen*, 180 Wn.2d at 478.

In contrast, we cannot consider "'[f]acts or allegations contained in the record, if not directly related to the elements of the charged crime, [which] may not have been sufficiently proven in the trial.'" *State v. Davis*, 3 Wn. App. 2d 763, 778, 418 P.3d 199 (2018) (internal quotations marks omitted) (quoting *In re Pers. Restraint of Lavery*, 154 Wn.2d 249, 255, 111 P.3d 837 (2005)). Thus, we do not consider facts in the charging document that are untethered to the elements of the crime charged. *Davis*, 3 Wn. App. 2d at 780; *see also State v. Howard*, 15 Wn. App. 2d 725, 734, 476 P.3d 1087 (2020), *review denied*, 197 Wn.2d 1006, 483 P.3d 783 (2021).

1. *Proof of Prior Convictions*

We hold that the State proved by a preponderance of the evidence the existence of French's North Carolina criminal history.

The State must prove by a preponderance of the evidence the existence of the defendant's prior conviction. *Wilson*, 113 Wn. App. at 136. "When the prior convictions at issue are under the same name as the defendant before the sentencing court, identity of names is sufficient proof of this requirement." *State v. Powell*, 172 Wn. App. 455, 459, 290 P.3d 353 (2012).

The State must provide reliable evidence to establish the defendant's criminal history, and a certified copy of the judgment is the best evidence of that history. *Wilson*, 113 Wn. App. at 136. The State may also provide comparable documents of record or transcripts of the relevant proceedings to establish the defendant's criminal history as well. *Wilson*, 113 Wn. App. at 136.

Regarding French's assault with a deadly weapon conviction from March 21, 2000, the State submitted copies of the indictment, the "Transcript of Plea," and the judgment and

sentence. Volume 1, Exhibits 1-2, PDF at 1, 4, 7. Regarding French's possession of a stolen motor vehicle conviction from November 6, 2006, the State submitted copies of the indictment, the "Transcript of Plea," and the judgment and sentence. Volume 1, Exhibits 3-4, PDF at 1, 21, 24. Notably, the judgments regarding both charges are certified copies. Volume 1, Exhibits 2, 4, PDF at 11, 24, 26. The certified copies of the judgments in addition to the plea transcripts and indictments are sufficient to prove that French was the person named in the North Carolina convictions.

Accordingly, we hold that the State proved by a preponderance of the evidence the existence of French's prior North Carolina convictions.

2. *Factual Comparability of the North Carolina Assault with a Deadly Weapon Conviction*

French argues that his March 21, 2000 North Carolina assault with a deadly weapon conviction is not comparable to the Washington offense of second degree assault because there is no evidence that French had the specific intent to commit that crime, which is required to prove second degree assault under Washington law. In his supplemental brief, French argues that the sentencing court erred in ruling that his March 2000 North Carolina assault with a deadly weapon conviction was factually comparable to the Washington crime of second degree assault because the North Carolina record does not prove that French intended to swing the bat, nor prove the severity of the victim's injuries. We disagree.

French pleaded guilty to assault with a deadly weapon under N.C. GEN. STAT. § 14-32(b). Under that statute, the state must prove "(1) an assault (2) with a deadly weapon (3) inflicting

serious injury (4) not resulting in death." *State v. Woods*, 126 N.C. App. 581, 592, 486 S.E.2d 255 (1997) (quoting *State v. Aytche*, 98 N.C. App. 358, 366, 391 S.E.2d 43 (1990)).

Assault with a deadly weapon "is not a specific intent crime" in North Carolina. *Woods*, 126 N.C. App. at 587. For most crimes, the State must prove that the defendant acted with either specific or general intent. *State v. Barnes*, 229 N.C. App. 556, 560, 747 S.E.2d 912 (2013), *aff'd*, 367 N.C. 453, 756 S.E.2d 38 (2014). Because a defendant may commit the crime of assault with a deadly weapon in North Carolina without any specific intent, the crime is a general intent crime.

In turn, general intent crimes require only "the doing of some act." *State v. Johnson*, 379 N.C. 629, 638, 866 S.E.2d 725 (2021) (quoting *State v. Jones*, 339 N.C. 114, 148, 451 S.E.2d 826 (1994)). For general intent crimes, the State must prove that the defendant had the general intent to do the proscribed act. *State v. Ayers*, 261 N.C. App. 220, 225, 819 S.E.2d 407 (2018) (for example, regarding the general intent crime of second degree murder, the State must prove only the general intent to strike the blow, not the specific intent to assault a victim with the intent to kill).

As mentioned above, we determine the effect of a plea agreement entered in foreign jurisdiction by the law of that jurisdiction. *See Olsen*, 180 Wn.2d at 478. Under North Carolina law, a guilty plea "serves as an admission of all the facts alleged in the indictment or other criminal process." *State v. Thompson*, 314 N.C. 618, 624, 336 S.E.2d 78 (1985).

In Washington, RCW 9A.36.021(c) defined second degree assault as follows: "A person is guilty of assault in the second degree if he or she, under circumstances not amounting to assault in the first degree: . . . Assaults another with a deadly weapon."

Because that statute does not define "assault," courts employ the three common law definitions of assault: "'(1) an unlawful touching (actual battery); (2) an attempt with unlawful force to inflict bodily injury upon another, tending but failing to accomplish it (attempted battery); and (3) putting another in apprehension of harm.'" *State v. Abuan*, 161 Wn. App. 135, 154, 257 P.3d 1 (2011) (quoting *State v. Elmi*, 166 Wn.2d 209, 215, 207 P.3d 439 (2009)).

Actual battery occurs where the defendant intentionally touches or strikes someone in a harmful or offensive manner regardless of whether it results in a physical injury. *State v. Cardenas-Flores*, 189 Wn.2d 243, 266, 401 P.3d 19 (2017). To prove actual battery, the state must prove only "intent to do the physical act constituting assault[,]" rather than specific intent to inflict harm or cause apprehension. *State v. Hall*, 104 Wn. App. 56, 62, 14 P.3d 884 (2000).

And as discussed above, a deadly weapon for purposes of second degree assault is an "instrument . . . which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or substantial bodily harm." RCW 9A.04.110(6). "'Circumstances' include 'the intent and present ability of the user, the degree of force, the part of the body to which it was applied and the physical injuries inflicted.'" *Shilling*, 77 Wn. App. at 171 (quoting *Sorenson*, 6 Wn. App. at 273). "Ready capability is determined in relation to surrounding circumstances, with reference to potential substantial bodily harm." *Shilling*, 77 Wn. App. at 171.

In his North Carolina plea agreement, French agreed that "there is a factual basis for the entry of the plea." Volume 1, Exhibit 2, PDF at 8. And the indictment reads "the defendant named above unlawfully, willfully and feloniously did use a metal baseball bat, a deadly

27

weapon, to assault an inflict serious injury upon Corey Damarr by hitting him numerous times with the bat." Volume 1, Exhibit 1, PDF at 4.

Under *Olsen*, we may look to North Carolina law to determine the effect of French's plea agreement. Therefore, French admitted to all the facts in the indictment by pleading guilty. To establish factual comparability, the facts in the indictment must prove that French's conduct would have constituted Washington second degree assault, which the defendant may commit by intentionally touching or striking someone in a harmful or offensive manner with a deadly weapon.

To be convicted of North Carolina's assault with a deadly weapon crime, the State must prove that French had the general intent to commit the underlying act of the charge. Accordingly, the "willfully" language in the indictment is not untethered from the elements of the crime charged to the extent it shows that French had the general intent to hit someone with a bat numerous times. Considering that language, the indictment shows that French had sufficient intent to commit actual battery in Washington. Next, the indictment proved that French struck someone numerous times with a metal bat, which is a harmful or offensive contact. Lastly, the circumstances of the metal bat's use—hitting someone numerous times thereby inflicting serious injury—supports the conclusion that the metal bat was a deadly weapon under the circumstances. Moreover, when a metal bat is used to strike someone numerous times, that bat is readily capable of causing death or substantial bodily injury. Accordingly, the bat French used in North Carolina constituted a deadly weapon for purposes of the Washington offense of second degree assault.

Therefore, we hold that French's 2000 North Carolina assault with a deadly weapon conviction was factually comparable to the Washington crime of second degree assault.

28

No. 55766-5-II

3. *Factual Comparability of the North Carolina Possession of a Stolen Motor Vehicle Conviction*

French contends that his November 16, 2006 North Carolina possession of a stolen motor vehicle conviction is not factually comparable to first degree possession of stolen property under Washington law because there is no evidence that French had a specific intent to steal, which is required to prove possession of stolen property in Washington. In his supplemental brief, French argues that the sentencing court erred in finding that his North Carolina possession of a stolen motor vehicle conviction was factually comparable to the Washington crime of first degree possession of stolen property because the North Carolina record did not prove that French withheld the stolen vehicle from its true owner. We disagree.

In November 2006, in North Carolina, French pleaded guilty to Possession of a Stolen Motor Vehicle under N.C. GEN. STAT. § 20-106. Volume 1, Exhibit 4, PDF at 26-29. French agreed that there was "a factual basis for the entry of the plea." Volume 1, Exhibit 4, PDF at 27. The indictment for that matter read as follows:

> the defendant named above unlawfully, willfully and feloniously did have and possess a 1997 Pontiac Grand Am . . . , a motor vehicle, the personal property of Boyette Auto Sales, valued at $2,500.00, which property was stolen property knowing and having reasonable grounds to believe the property to have been feloniously stolen, taken and carried away.

Volume 1, Exhibit 3, PDF at 21. Former N.C. GEN. STAT. § 20-106 provided in pertinent part:

> Any person who, with intent to procure or pass title to a vehicle which he knows or has reason to believe has been stolen or unlawfully taken, receives or transfers possession of the same from or to another, or who has in his possession any vehicle which he knows or has reason to believe has been stolen or unlawfully taken.

29

Former N.C. GEN. STAT. § 20-106, *recodified as* § N.C. GEN. STAT. 14-71.2. In North Carolina, the defendant need not to possess a "felonious intent" to commit Possession of a Stolen Motor Vehicle. *State v. Abrams*, 29 N.C. App. 144, 146, 223 S.E.2d 516 (1976).

In Washington, former RCW 9A.56.150(1) (2006) provided: "A person is guilty of possessing stolen property in the first degree if he or she possesses stolen property other than a firearm as defined in RCW 9.41.010 which exceeds one thousand five hundred dollars in value." And "'possessing stolen property' means knowingly to receive, retain, possess, conceal, or dispose of stolen property knowing that it has been stolen and to withhold or appropriate the same to the use of any person other than the true owner or person entitled thereto." RCW 9A.56.140(1). The withholding language from the aforementioned statute does not add an essential element to former RCW 9A.56.150, but rather "limits and defines the scope of the essential element." *State v. Porter*, 186 Wn.2d 85, 92, 375 P.3d 664 (2016). To be guilty of this offense, the State must prove "actual or constructive knowledge that the property is stolen." *State v. Summers*, 45 Wn. App. 761, 763, 728 P.2d 613 (1986).

As reasoned above, because French pleaded guilty, he admitted to all the facts in the indictment. The facts in the indictment provide a basis for factual comparability. The indictment showed that French actually possessed stolen property—a 1997 Pontiac Grand Am. Further, the indictment showed that the Pontiac was valued at $2,500, which satisfies the value element of the Washington statute. Additionally, the indictment proved that French had actual and constructive knowledge that the Pontiac was stolen. The language in the indictment that French "[knew] and [had] reasonable grounds to believe the property to have been feloniously stolen, taken and carried away" is not untethered from the elements of the crime charged because

former N.C. GEN. STAT. § 20-106 required the State to prove that the defendant "knows or has reason to believe [the property] has been stolen or unlawfully taken." Lastly, to the extent that French argues that the indictment is insufficient because it did not show that French withheld the Pontiac from its true owner, the withholding language from former RCW 91.56.140(1) is not an essential element of first degree possession of stolen property, but merely defines the scope of the essential element of "possession of stolen property." As such, the indictment does not need to contain language that French withheld the Pontiac from its true owner.

Accordingly, we hold that French's North Carolina conviction for possession of a stolen motor vehicle was factually comparable to the Washington offense of first degree possession of stolen property.

D.    *Ineffective Assistance of Counsel*

French argues that the trial court erred by denying his motion for a new trial on the grounds of ineffective assistance of counsel. Specifically, French claims his counsel performed deficiently because (1) counsel failed to request lesser included offense instructions for attempted murder and second degree assault; (2) counsel failed to investigate the persistent offender notice in his July 23, 2020 plea deal and during trial; and (3) counsel failed to request a missing evidence instruction about the Toyota.

When the defendant claims ineffective assistance of counsel, he "bears the burden of establishing both 'that counsel's performance was deficient' and that 'the deficient performance prejudiced the defense.'" *State v. Carson*, 184 Wn.2d 207, 216, 357 P.3d 1064 (2015) (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). We

review ineffective assistance of counsel claims de novo. *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017).

Counsel's performance is deficient if it falls "below an objective standard of reasonableness based on consideration of all the circumstances." *Estes*, 188 Wn.2d at 458 (quoting *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)). There is a strong presumption that counsel's performance was reasonable. *Estes*, 188 Wn.2d at 458. Where the challenged conduct can be characterized as a legitimate trial strategy or tactic, counsel's performance is not deficient. *Estes*, 188 Wn.2d at 458.

If counsel's performance was deficient, the defendant must show that he was prejudiced by such performance by showing that "there is a reasonable probability that 'but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *Estes*, 188 Wn.2d at 458 (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). A reasonable probability is "a probability sufficient to undermine confidence in the outcome" but less than a preponderance standard. *Estes*, 188 Wn.2d at 458.

1. *Lesser Included Instructions*

French argues he received ineffective assistance of counsel because his counsel failed to request lesser included offense instructions as to attempted first degree murder and second degree assault. We disagree.

"[T]he decision to exclude or include lesser included offense instructions is a decision that requires input from both the defendant and her counsel but ultimately rests with defense counsel." *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). Moreover, "the complex

interplay between the attorney and the client in this arena leaves little room for judicial intervention." *Grier*, 171 Wn.2d at 40.

And where a jury found the defendant guilty of second degree murder, the Supreme Court held there was no prejudice for failure to request a lesser included offense instruction because "assuming, as this court must, that the jury would not have convicted Grier of second degree murder unless the State had met its burden of proof, the availability of a compromise verdict would not have changed the outcome of Grier's trial." *Grier*, 171 Wn.2d at 43-44.

French's counsel did request lesser included offense instructions as to both second degree assault counts that French faced. And so, his allegation that his counsel failed to request those instructions is meritless.

Next, even assuming French could show that counsel's failure to request a lesser included offense instruction as to attempted first degree murder was deficient, he cannot show that counsel's failure to do so was prejudicial. The jury found French guilty beyond a reasonable doubt of attempted first degree murder. We infer, as we must, that the jury convicted French because the evidence showed he was guilty beyond a reasonable doubt. And so, the availability of a compromise verdict would not have changed the outcome of French's trial. Accordingly, we hold that French did not receive ineffective assistance counsel on this ground.

2. *Investigation of Persistent Offender Notice*

French argues that his counsel performed deficiently because his counsel failed to investigate the persistent offender notice that the State filed for purposes of plea bargaining and trial. French argues that if counsel had done so, he could have proven that his North Carolina convictions were not comparable, and therefore, the State's plea offer would not have been based

off the presumption that he was a persistent offender. We do not review this ground for ineffective assistance of counsel because the record is insufficient.

Although the State filed a persistent offender notice in this matter, French was not sentenced as a persistent offender. So, any prejudice that French may have suffered from his counsel's alleged failure to do proper research regarding his status as a persistent offender would relate to counsel's representation during plea bargaining. But our record does not contain sufficient information about how counsel researched this matter, and to what extent, counsel communicated with French regarding this matter. Accordingly, we do not address this assertion because it is based on matters outside the record. *State v. Alvarado*, 164 Wn.2d 556, 569, 192 P.3d 345 (2008); RAP 10.10(c).

3. *Failure to Request Missing Evidence Instruction*

French argues that he received ineffective assistance of counsel because his counsel failed to request a missing evidence instruction regarding the Toyota. We disagree.

To establish ineffective assistance of counsel based on a failure to request a jury instruction, the defendant must first show that he was entitled to that instruction. *See State v. Cienfuegos*, 144 Wn.2d 222, 227, 25 P.3d 1011 (2001). "The missing evidence instruction is a permissive inference instruction that informs the jury that 'where evidence which would properly be part of a case is within the control of the party whose interest it would naturally be to produce it, and, . . . he fails to do so,—the jury may draw an inference that it would be unfavorable to him.'" *State v. Derri*, 17 Wn. App. 2d 376, 404, 486 P.3d 901, *review granted in part*, 198 Wn.2d 1017, 497 P.3d 389 (2021), *and aff'd but criticized*, 199 Wn.2d 658, 511 P.3d 1267 (2022) (internal quotation omitted) (quoting *State v. Blair*, 117 Wn.2d 479, 485-86, 816 P.2d 718

(1991)). A missing evidence instruction is not warranted when the evidence is unimportant, merely cumulative, or when its absence is satisfactorily explained. *Derri*, 17 Wn. App. 2d at 404.

Here, French cannot show that he is entitled to a missing evidence jury instruction because the Toyota is cumulative and not material evidence. The State produced many photographs of the Toyota from various angles, including the three rusty holes. Accordingly, the actual Toyota constitutes cumulative evidence under these circumstances. Moreover, the absence of the Toyota was satisfactorily explained. The law enforcement agency had a policy to retain vehicles for the entire matter only in homicide cases and certain civil matters. But this was not a homicide case. Accordingly, the Toyota was released in accordance with law enforcement policy, which satisfactorily explained the Toyota's absence. And, as discussed above, the Toyota is not material evidence because even if French could perform additional testing on the vehicle, he would be unable to show that Stith shot at the vehicle to support his strained self-defense theory. *See supra* Part III.

Given the weak legal foundation for such an instruction under the circumstances, we hold that counsel's performance did not fall below an objective standard of reasonableness by failing to request a missing evidence instruction. As such, we hold that counsel did not perform deficiently for failure to request this instruction.

In sum, we hold that the trial court did not err when it denied French's motion for a new trial on ineffective assistance grounds.

E.      *Prior Bad Acts and Personal Opinions*

French argues that the trial court erred by denying French's motion to exclude the following evidence: prior bad acts, witnesses offering personal opinion testimony, the State offering personal opinion testimony, and to exclude witnesses.[3]  We disagree.

A trial court's decision to admit or exclude evidence under ER 404(b) is reviewed for an abuse of discretion.  *State v. McCreven*, 170 Wn. App. 444, 457, 284 P.3d 793 (2012).  A trial court abuses its discretion when its ruling is manifestly unreasonable, or based upon untenable grounds or for untenable reasons.  *State v. Downing*, 151 Wn.2d 265, 272, 87 P.3d 1169 (2004).

Regarding prior bad acts, ER 404(b) provides,

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

"Evidence of prior bad acts is presumptively inadmissible."  *McCreven*, 170 Wn. App. at 458.  Additionally, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."  ER 403.  Before admitting evidence of prior bad acts under ER 404(b), courts must engage in a three-part analysis: "The court must identify the purpose for which the evidence will be admitted; the evidence must be materially relevant to that purpose; and the court must balance the probative value of the evidence against any unfair prejudicial effect the evidence may have upon the fact finder."  *State v. Freeburg*, 105 Wn. App. 492, 497, 20 P.3d 984 (2001).

---

[3] The trial court granted French's motion to exclude witnesses, so this opinion does not discuss this.

Under ER 404(b), "[e]vidence of flight is admissible if it creates 'a reasonable and substantive inference that defendant's departure from the scene was an instinctive or impulsive reaction to a consciousness of guilt or was a deliberate effort to evade arrest and prosecution.'" *Freeburg*, 105 Wn. App. at 497 (quoting *State v. Nichols*, 5 Wn. App. 657, 660, 491 P.2d 677 (1971)). This includes "evidence of resistance to arrest, concealment, assumption of a false name, and related conduct . . . if they allow a reasonable inference of consciousness of guilt of the charged crime." *Freeburg*, 105 Wn. App. at 497-98. And "while the range of circumstances that may be shown as evidence of flight is broad, the circumstance or inference of consciousness of guilt must be substantial and real, not speculative, conjectural, or fanciful." *Freeburg*, 105 Wn. App. at 498.

Next when determining the probative value of flight evidence, we consider the following inferences: "(1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged." *Freeburg*, 105 Wn. App. at 498.

1. *Unpreserved Challenges to Prior Bad Acts*

The prior bad acts that French argues shouldn't have been admitted are his (1) pre- and post-*Miranda* statements, (2) his cell phone records, (3) information about his attempts to elude law enforcement, (4) information about his possession of a stolen motor vehicle charge, and (5) information about his possession of a stolen firearm.

Regarding French's motion to exclude prior bad acts, the State asked whether this motion would cover the attempt to elude, the theft of the Toyota, and tying French to the firearm that

37

was found. In response, French's counsel said, "I was trying to cover everything, potentially, else. I assume the facts related to our incident here the Court was going to allow. I'm trying to make sure that there's nothing else." RP (Aug. 31, 2020) at 110.

French failed to object under ER 404(b) to evidence about attempting to elude the police, the possession of a stolen motor vehicle, and the possession of a stolen firearm. Additionally, after the CrR 3.5 hearing, French also failed to object to admissibility of his statements under ER 404(b). Therefore, he cannot challenge the admissibility of the aforementioned evidence on appeal. RAP 2.5(a).

However, French did object to Officer Calata's testimony about his attempt to elude law enforcement under ER 404(b). Accordingly, that will be addressed below.

2. *Attempting to Elude*

Before Deputy Calata testified about how he located French, French asked that Deputy Calata be prohibited from "go[ing] into the details about the elude any more than just the basic foundation he needs to get to where we are, . . . and it's 404(b), I guess." RP (Sept. 24, 2020) at 1612. The trial court admitted the evidence of French attempting to elude the police as evidence of flight. The court admonished the State to be brief in eliciting information about French eluding the police, and allowed the State to use leading questions to keep the scope of the elusion testimony narrow.

The trial court did not abuse its discretion when it determined that Deputy Calata's testimony about how French attempted to elude him created a reasonable and substantive inference of French's consciousness of guilt for the crimes charged or was a deliberate effort to evade arrest and prosecution. Although it had been several weeks since French had shot

Martinez, a warrant had issued for his arrest. As his prior shooting was serious conduct, it was reasonable for the jury to infer that French knew that there were outstanding warrants for his arrest, and that his final effort to evade officers could reasonably be attributed to his consciousness of guilt. To the extent that French's motivation to conceal himself arose from uncharged crimes in this matter, it was for the jury to determine whether to draw the inference urged by the State. Notably, French failed to argue any additional grounds for why this evidence should be excluded at the hearing, more than "it's 404(b), I guess." RP (Sept. 24, 2020) at 1612.

Accordingly, we hold that the trial court did not abuse its discretion in admitting evidence of French attempting to elude the police in his vehicle.

3. *Cell Phone Records*

French argues that the trial court erred in admitting his cell phone records because they are prior bad acts. We disagree.

The State sought to admit two exhibits, that together constituted about 90 pages, which showed the search history from French's phone after the shooting incident and before French's arrest. The State sought to admit these exhibits as consciousness of guilt evidence. The exhibits contained search history records, such as a search for cities with the largest black populations, a search regarding how U.S. Marshalls track fugitives, a search regarding how to outrun a police officer, and searches regarding buying fake IDs, among many other things. The State agreed to substantial redactions of inflammatory material in the exhibits.

French argued that these exhibits should have been excluded because they were more prejudicial than probative as they related to more than just the charged offenses. But French also admitted that the exhibits were "very strong evidence of knowledge of the incident." RP (Sept.

24, 2020) at 1688.  The court noted that the exhibits show that French investigated his status

post-shooting, and, arguably, that he was on the run and attempting to stay abreast of events.

The trial court ruled that the State could use the exhibits as illustrative exhibits.  The court

allowed the detective to say that there were a large volume of searches.  The court ruled that the

probative value was not substantially outweighed by the prejudicial impact of the exhibits.

French's search history is "related conduct" to concealment.  Additionally, French's

search history, which shows he looked up information about how to evade law enforcement in

various manners, clearly provided a reasonable inference of consciousness of his guilt.

Accordingly, French's search history was properly considered evidence of flight that was

admissible under ER 404(b).

The next question is whether, given that the search history was probative of French's

consciousness of guilt, whether the probative value substantially outweighed the danger of unfair

prejudice.  The prejudice that French appeared to argue at trial was that the search history was so

expansive that it could not be "sanitize[d]" enough, which made it unduly prejudicial.  RP (Sept.

24, 2020) at 1687.  But that prejudice was reduced in two ways: (1) French and the State agreed

to substantial redactions of inflammatory material in the search history; and (2) the court did not

allow the jury to have all of the exhibits during its deliberation.  Rather, the court required the

State to publish individual pages from the exhibits instead of the entire roughly 90 pages.

Given that French's search history was highly probative and that the substantial

redactions and a limited publication ruling lessened the prejudice of the search history, we hold

that the trial court did not abuse its discretion in admitting evidence of French's cell phone

records.

### 4. *State's Personal Opinion*

The personal opinion testimony French complains about is that the State offered the personal opinion that "maybe French [shot] his own car." SAG at 14. French provides no argument to support this alleged error, and this opinion is not easily located in the voluminous record on appeal. We are not obligated to search the record in support of claims made in French's SAG because French has failed to inform us of "the nature and occurrence of alleged errors." RAP 10.10(c).

F.     *LFO*

French argues that the trial court erred by failing to waive his LFO. French cites House Bill 1783 as support for the contention that we must waive all discretionary costs because his income is 125 percent below the federal poverty guidelines. We disagree.

After a finding of guilt, the trial court is required to impose a $500 penalty assessment "for each case or cause of action that includes one or more convictions of a felony or gross misdemeanor." RCW 7.68.035(1)(a). This penalty assessment is a mandatory LFO. "An offender being indigent as defined in RCW 10.101.010(3) (a) through (c) is not grounds for failing to impose restitution or the crime victim penalty assessment under RCW 7.68.035." RCW 9.94A.760(1). House Bill 1783 did not repeal this mandatory LFO. *State v. Catling*, 193 Wn.2d 252, 259-60, 438 P.3d 1174 (2019).

The only LFO the court imposed was a $500 crime victim assessment on French. The court was required to impose this LFO, and House Bill 1783 did not change this fact. Accordingly, we hold that the trial court did not err by imposing the $500 crime victim assessment penalty.

No. 55766-5-II

CONCLUSION

We hold that the State presented sufficient evidence to show that the aluminum bat was a deadly weapon for purposes of second degree assault and for purposes of deadly weapon sentencing enhancements. We hold that the trial court did not violate French's right to a unanimous jury verdict because sufficient evidence supported the alternative means of committing burglary. We further hold that the State did not violate its duty to preserve evidence because the Toyota is potentially useful evidence, and the State did not act in bad faith in disposing of it. We hold that the issues raised in the SAG have no merit. Consequently, we affirm French's convictions and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, P.J.

We concur:

Veljacic, J.

Price, J.

42